[No. C058105. Third Dist. Apr. 29, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT CHESTER HENNING, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts I.–VI. and VIII.–XI.

■■■■■■■■■■■■■■■■

COUNSEL

Barbara Coffman, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Jamie A. Scheidegger, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**CANTIL-SAKAUYE, J.**—Defendant, Robert Chester Henning, financially abused five elderly victims who came to him to purchase products to assist their physical mobility. A jury convicted him in case No. 62-072400 (consolidated with case Nos. 62-072639 and 62-075042) of five counts of financial elder abuse in violation of Penal Code section 368, subdivision (d),[1] and five counts of grand theft by false pretenses in violation of sections 484 and 487, subdivision (a). We refer to case No. 62-072400 as the financial elder abuse case. Based on the evidence presented to the jury on the financial elder abuse case, the trial court found defendant in violation of his probation in an earlier case (case No. 62-026649, hereafter the securities violation case). In that case defendant pled guilty to four counts of violating Corporations Code sections 25110 and 25540—selling unregistered, nonexempt securities.

The trial court sentenced defendant on the financial elder abuse case to state prison for the upper term of four years on count one, his conviction of financial elder abuse of Jeanette K., and to a consecutive one-year term (one-third of the middle term) on each of counts two through five, his convictions of financial elder abuse of Helen B., Doreen Y., Logan Y., and Grace R. The trial court imposed consecutive eight-month terms for counts six through 10, his convictions of grand theft by false pretenses, but stayed execution of the terms pursuant to section 654. After finding defendant had violated his probation on his securities violation case, the trial court sentenced defendant to consecutive eight-month terms (one-third of the middle term) for each of his four convictions of selling unregistered, nonexempt securities. Defendant's total prison sentence was 10 years eight months.[2]

---

[1] Defendant sometimes refers to these counts as theft from an elder. We choose to refer to these counts as financial elder abuse. Further undesignated statutory references are to the Penal Code.

[2] The abstract of judgment accurately reflects each of the imposed prison terms, but erroneously reflects the total time imposed and not stayed as eight years. The correct total is 10 years eight months. Because this is simply a clerical error, we correct it on appeal and will

On appeal, defendant raises 11 claims regarding the financial elder abuse case. He contends the trial court erred in the admission of evidence and made instructional errors, that insufficient evidence supports his 10 convictions, that counts three and four are based on the same conduct, requiring the sentence on one of the counts to be stayed pursuant to section 654, and that his convictions for grand theft must be stricken as lesser included offenses of his financial elder abuse convictions. We shall affirm the judgment.

## FACTUAL BACKGROUND

We summarize the facts in the light most favorable to the judgment. (*People v. Hatch* (2000) 22 Cal.4th 260, 272 [92 Cal.Rptr.2d 80, 991 P.2d 165].)

*Victim Jeanette K.*

Eighty-three-year-old Jeanette K. lives in a trailer at a mobilehome park on her Social Security and a small pension. She is housebound and sleeps in a lift chair. In March of 2007, Jeanette K.'s daughter took her to defendant's store, National Medical Services (NMS), to purchase a new lift chair. Defendant showed Jeanette K. some brochures and later visited her home. Jeanette K. agreed to purchase a lift chair and gave defendant a check for $1,000 as payment in full in advance. Defendant told her the chair would be delivered in three weeks and cashed her check. Jeanette K. signed a sales slip or receipt reflecting the purchase.

When the chair did not arrive, Jeanette K. called NMS and talked to defendant. Defendant told her the chair was still in the shop or there was trouble with it. After a series of further phone calls by Jeanette K. and her daughter over a couple of months, Jeanette K. and her daughter returned to defendant's store. Defendant told them the chair had been destroyed when the truck transporting it was in an accident and caught fire. Defendant told Jeanette K. he could get another one in 10 or 11 days. Jeanette K. agreed to wait, but if the chair did not arrive in that time, she wanted her money back. Defendant told Jeanette K. he could not write her a refund check as he was

direct the trial court to amend the abstract of judgment accordingly. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185 [109 Cal.Rptr.2d 303, 26 P.3d 1040] ["Courts may correct clerical errors at any time, and appellate courts . . . that have properly assumed jurisdiction of cases have ordered correction of abstracts of judgment that did not accurately reflect the oral judgments of sentencing courts."].) Any party aggrieved by this procedure may petition for rehearing. (Gov. Code, § 68081.)

not the owner, but only the manager of the store. Jeanette K. never received the chair or her money back.

*Victims Doreen Y. and Logan Y.*

Eighty-three-year-old Logan Y. and his 81-year-old wife, Doreen Y., wanted a trailer to carry Logan Y.'s motorized scooter. They went to NMS where defendant offered to sell them a $2,200 trailer for a discounted price of $1,800 if they paid with a cashier's check. They gave defendant a cashier's check for that amount. Doreen Y. later called defendant to order a hitch for the trailer and gave defendant their credit card number to pay the $316 cost of the hitch. Two days later there was a $3,901 charge on their credit card account to defendant's store, although they had not bought anything in that amount and had not authorized the charge. They tried to contact defendant, but he did not answer the store phone and he was not in the store when Logan Y. went by to discuss the matter. Doreen Y. contacted the credit card company fraud department and eventually had the charge reversed.

Doreen Y. and Logan Y. denied they purchased a bed from defendant that accounted for the charge to their credit card account.[3]

Logan Y. and Doreen Y. received the trailer about a month after it was ordered. Defendant promised to register the trailer title for them, but actually registered the trailer in the name of Independent Mobility Products (IMP), a business owned by Elizabeth Henning, defendant's ex-wife.

*Victim Grace R.*

Seventy-four-year-old Grace R. lives by herself in a mobilehome trailer. She uses a wheelchair to get around. She called NMS and spoke with defendant about purchasing a lift for the back of her car to transport her power chair. Defendant came to her trailer to discuss her purchase. They agreed on a purchase price of $800 for the lift. Defendant told Grace R. she had to pay in cash. Grace R. borrowed the money from her sister-in-law and gave defendant $800 in cash. Defendant gave her a receipt and told her it would take approximately two months for the lift to arrive as it was coming from Florida.

When the lift did not arrive as promised, Grace R. called defendant. Defendant told Grace R. there had been a hurricane in Florida and the lift was

---

[3] Logan Y. was unavailable to testify at trial. His testimony was introduced through the presentation of the videotape of his testimony at defendant's preliminary hearing, which also served as a conditional examination of Logan Y.

held up or destroyed. Grace R. believed him and waited another period of time for the lift to arrive. When she did not receive it, she called again. This time defendant told her the business in Florida was behind and it would take longer for the lift to arrive. While she was still waiting, Grace R. heard defendant was in jail. She called and made a report of defendant's actions regarding her lift. She never received the lift or her money back. She is still paying her sister-in-law back for the loan of the money.

*Victim Helen B.*

Eighty-six-year-old Helen B. has limited mobility. She visited NMS as she was interested in seeing if she could get a motorized scooter that would fit in her small car. Defendant did not have what Helen B. was looking for in the store, but assured her a motorized scooter could be found to fit her needs. Defendant came to her home the next day to show her two scooters. Helen B. was not satisfied with the models defendant brought, but agreed to purchase a four-wheel scooter from a catalog on defendant's assurance that it would work for her. Defendant told her it was available at a special price for a limited time of $1,395. Helen B. gave defendant a personal check for that amount. Defendant told Helen B. the scooter was coming from Fresno and it would arrive the following week. Defendant immediately cashed the check.

When the scooter did not arrive after four weeks, Helen B. called NMS and got a taped message. When defendant finally returned her call, he told Helen B. his staff had forgotten to order the scooter, but he would place the order. Helen B. waited another three weeks before calling defendant again. This time defendant told her that the manufacturing company did not have the color she ordered. Helen B. told defendant she did not care about the color and defendant said he would let the company know right away. Later defendant called and offered Helen B. a different scooter if she gave him an additional $200. Helen B. refused as she wanted the original, smaller scooter because she had a small car.

Finally, defendant called Helen B. to tell her the scooter had been shipped and would arrive on May 22. On May 21, Helen B. received a message from defendant asking her to call. Helen B. called defendant and left a message that she would be available at home for delivery of the scooter anytime on the 22d. Defendant called to say he could not deliver the scooter on the 22d, but would deliver it on the 23d. On May 23, defendant called to say he was running late. He would deliver the scooter around 5:30 p.m. When defendant showed up with a scooter, Helen B. was tired. She signed the paper he showed her and directed him to put the scooter in her living room. A couple

of days later, Helen B. examined the receipt and scooter and noticed defendant had delivered a different scooter than the one she had ordered. The scooter defendant delivered would not fit in her car. Helen B. tried to contact defendant, but never heard back from him. Helen B. never received the scooter she ordered or a refund. Helen B. contacted the sheriff's department.

*Detective Hudson*

Placer County Sheriff's Detective James Hudson investigated several complaints of fraud involving defendant and NMS. NMS was located in the City of Auburn. There were two signs above the door of the store; one for NMS and one for IMP. The 2004 fictitious business statement for NMS showed defendant as the business registrant. The 2005 fictitious business statement showed Lawrence Orzalli (defendant's stepson) as the new owner. Hudson contacted Elizabeth Henning inside the store. She told Hudson her function at the store was to do the Medicare billings. Hudson never found anyone who had any contact with Orzalli at the store.

In August 2007, Hudson executed a search warrant at the store. Hudson seized hundreds of medical assistance supplies, but did not find any office records, files or paperwork. Defendant's desk drawers had been emptied. Hudson found, but did not seize, about 10 bags of coffee at the store. When Hudson confronted defendant, Hudson accused defendant of being dishonest and called him a crook. Defendant nodded affirmatively. Hudson showed defendant a form signed by Orzalli and said, "But you're the crook." Defendant answered "yes." Defendant's explanation for nondelivery of items was that he was just an employee of the store. He did not own the store and complaints had to be forwarded to Orzalli. Defendant claimed he had no idea how to contact Orzalli.

Hudson tracked Orzalli to the Bay Area. Orzalli told Hudson he allowed defendant to use his name to open the business because defendant could not get credit. Orzalli said he did not have any ability to make decisions at the business. Defendant did.

*Uncharged Conduct Admitted into Evidence*

Sixty-seven-year-old Rosemary C. has multiple sclerosis, which has resulted in her using a wheelchair. She purchased a wheelchair ramp from defendant at NMS in 2005 using a credit card. In June 2007, she noticed an unauthorized charge of $740.48 from NMS on the same credit card account. She did not purchase anything from NMS after the wheelchair ramp in 2005. She had no dealings at all with defendant or NMS since that time. She did not authorize defendant to charge her credit card account for any amount.

Rosemary C.'s credit card company investigated and eventually reversed the charge.

*Prior Conduct from Case No. 62-026649—the Securities Violation Case*

James Becker is a special agent with the California Department of Justice, assigned to the special crimes unit of the Attorney General's office during 1999 to 2003. Becker testified he investigated defendant during that time for selling securities, specifically certificates of deposit. Becker spoke with 25 of defendant's alleged victims, ranging in age from 62 to 78.

Harry F. was a victim. Harry F. went to see defendant about buying an advertised certificate of deposit (CD).[4] Harry F. was not wealthy, but had a few dollars that he did not need to live on right away that he thought he could put into a CD. Harry F. told defendant he was interested in putting $30,000 into a three-year CD at the advertised rate of 6.5 percent interest. He did not want a 25-year CD because of his advanced age (Harry F. was 80 years old in 2003 when he testified at defendant's preliminary hearing). Defendant wrote up a contract for a 25-year CD. Defendant told Harry F. not to worry about it, that it was for three years, and that there was no penalty for early withdrawal. Harry F. went ahead with the transaction based on defendant's explanation. When Harry F. subsequently received the paperwork for the CD in the mail, he discovered he had interests in two CD's with 30-year terms with interest payable at maturity. When Harry F. questioned defendant, defendant told him not to worry. Harry F. knew something was wrong after he received statements reflecting large amounts of interest accrued for only a few months of investment. He was irked and wanted to get out from under the investment. Harry F. went to see defendant who told him he would have to sell it. Harry F. told defendant to sell the CD's because he wanted his $30,000 back. Defendant said he would handle it, but told Harry F. not to contact the bank as the bank would not know who he was. Harry F. continued to pursue the matter until defendant was evidently as irritated with Harry F. as Harry F. was with defendant. Defendant told Harry F. he would get Harry F. his money back if Harry F. signed a pledge to buy an annuity from defendant's company. Harry F. did so. Harry F. was "anxious" to get his money back.

Harry F. was credited with interest on the CD's and paid income taxes on the interest, but never received the interest. Eventually, Harry F. recovered

---

[4] Harry F. was deceased at the time of trial. His testimony was introduced by having Becker read portions of the preliminary hearing transcript and by the introduction of the transcript.

$24,931.26 of his initial investment after a receiver liquidated the company that held title to the CD's that held Harry F.'s money.

*Defense*

Defendant testified on his own behalf.

Defendant testified he was a financial planner prior to getting into the mobility equipment industry. He admitted suffering convictions on October 24, 2003, for four counts of violating Corporations Code section 25110. When asked for his understanding of the nature of that offense, defendant gave a garbled explanation suggesting the Department of Corporations erroneously considered CD's to be securities despite defendant's status as an FDIC broker.[5] Defendant claimed the Department of Corporations singled him out for prosecution.

Defendant explained his sale of CD's to Harry F. and claimed he had discussed the 25-year term with him. Defendant claimed Harry F. could liquidate at anytime. Defendant testified there was no such thing as a three-year CD. Defendant said he was paid a 3 percent commission for the sale to Harry F.

Defendant testified he owned R.C. Henning Coffee Company and during the time Orzalli owned NMS, defendant's primary role and source of income was selling and distributing coffee, which he did from the premises of NMS. Defendant claimed he was only a volunteer for NMS, helping his ex-wife and stepson to build their business. When defendant got proceeds for a sale for NMS, defendant would bring back the purchase order and give the money to his ex-wife. She made the deposits. All checks and credit cards were run through NMS's bank. The same was true for IMP. Defendant did not take any of the proceeds for himself.

As to Rosemary C., defendant did not remember her and had no knowledge of the later charge on her credit card account. Defendant had no idea who processed the charge.

As to Helen B., defendant claimed there were problems with the scooter she purchased. Initially it was not ordered and then it was not available in the color she wanted. Defendant claimed Helen B. agreed to accept the different scooter after they discussed its superiority.

---

[5] Defendant's explanation ignores the fact he was apparently selling share interests in CD's, not direct-issued CD's.

As to Jeanette K., defendant testified he wrote her refund check for $1,000 on June 20, 2007. He mailed the check the day he wrote it and never heard back from Jeanette K. again.

As to Grace R., defendant testified he would not accept a check from her relative made payable to Grace R. for the lift she ordered. Although he preferred not to take cash, he agreed in Grace R.'s case to accept cash. He did not tell her she had to pay in cash. The lift was not delivered to Grace R. because it was seized by the Placer County Sheriff's Department.

As to Logan Y., defendant testified Logan Y. phoned in an order to him for an adjustable bed and that Logan Y. authorized the $3,900 credit card charge for that purchase. Defendant claimed the trailer purchased by Logan Y. was registered to IMP because Elizabeth Henning wanted it done that way in case the customer did not accept the item. Once the item was delivered and accepted, the title would be registered in the customer's name.

Defendant testified Detective Hudson was belligerent when he came into the store, called defendant a crook and told defendant he was going to take everything defendant owned. Defendant remained calm and did not make any affirmative gesture in response. Hudson did not ask about records. There were records in the office that day and defendant would have showed Hudson any records he wanted. Hudson kept saying it did not matter and he did not want to hear it. Defendant denied moving any of the records.

## DISCUSSION

## I.–VI.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## VII.

## Instructional Error in CALCRIM No. 1804

The trial court instructed the jury on the elements of theft by false pretense pursuant to Judicial Council of California Jury Instructions (2006–2007)

---

*See footnote, *ante*, page 632.

CALCRIM No. 1804. With respect to the corroboration requirement of theft by false pretense, CALCRIM No. 1804 provides several options, as follows:

"You may not find the defendant guilty of this crime unless the People have proved that:

"[A. *The false pretense was accompanied by either a writing or false token*(;/.)]

"[OR]

"[(A/B). There was a note or memorandum of the pretense signed or handwritten by the defendant(;/.)]

"[OR]

"[(A/B/C). Testimony from two witnesses or testimony from a single witness along with other evidence supports the conclusion that the defendant made the pretense.]" (Italics added.)

The jury here was instructed with only option "A" that "[t]he false pretense was accompanied by either a writing or false token." Defendant claims this portion of CALCRIM No. 1804 is legally incorrect because it does not inform the jury the writing accompanying the false promise must also be false, i.e., it cannot be a true genuine document. Respondent asserts the statute requires a "false token" but makes no such requirement for a "writing." Defendant has the better argument.

Former section 1110 provided that a defendant could not be convicted of theft by false pretense "if the false pretense was expressed in language unaccompanied by *a false token or writing*, unless the pretense, or some note or memorandum thereof is in writing, subscribed by or in the handwriting of the defendant, or unless the pretense is proven by the testimony of two witnesses, or that of one witness and corroborating circumstances." (Former § 1110, enacted by Stats. 1872, amended by Stats. 1889, ch. 17, § 1, p. 14, Stats. 1905, ch. 533, § 3, p. 696, italics added.) In 1989 section 1110 was repealed and this same language was added to section 532 as subdivision (b). (Stats. 1989, ch. 897, §§ 22, 35, pp. 3065, 3070.) Thus, for more than a hundred years the California Penal Code has required corroboration for theft by false pretense by either "a false token or writing" or a writing subscribed by or in the handwriting of the defendant or testimony of two witnesses or testimony of one witness and corroborating circumstances.

■ Case law has construed the phrase " 'a false token or writing' " to require a false token or a false writing. A genuine writing not containing a false statement does not meet the statutory requirement. (*People v. Gibbs* (1893) 98 Cal. 661, 663–664 [33 P. 630]; *People v. Katcher* (1950) 97 Cal.App.2d 209, 213–214 [217 P.2d 757]; see *People v. Beilfuss* (1943) 59 Cal.App.2d 83, 91 [138 P.2d 332].) Such construction comports with the grammatical structure of the statutory phrase as the word "false" modifies both token and writing. ■ Such construction is also compelled by "the fundamental rule of statutory construction that requires every part of a statute be presumed to have some effect and not be treated as meaningless unless absolutely necessary. 'Significance should be given, if possible, to every word of an act. [Citation.] Conversely, a construction that renders a word surplusage should be avoided. [Citations.]' [Citations.]" (*People v. Arias* (2008) 45 Cal.4th 169, 180 [85 Cal.Rptr.3d 1, 195 P.3d 103].) If "false" does not modify "writing," so that any writing is sufficient, the further language of the statute, which provides an alternative form of corroboration through a writing subscribed by or in the handwriting of the defendant would be rendered meaningless. We confirm that this portion of section 532, subdivision (b), cannot be satisfied by a true or genuine writing.

■ CALCRIM No. 1804 fails to inform the jury that the writing must be false by inverting the sequence of the terms to read "a writing or false token." The instruction is erroneous and must be amended.

■ In this case, the jury was given only the erroneous portion of CALCRIM No. 1804 regarding corroboration. Thus, the jury was not instructed correctly that the corroborating writing must be false and it was not instructed as to the other possible methods of corroboration. Nevertheless, we find the error to be manifestly harmless under any standard of review. The jury convicted defendant of all five counts of grand theft by false pretense. The evidence established a similar type of scheme and kind of false pretense by defendant in getting the victims to part with their money. Abundant, indeed overwhelming, corroboration was present in the testimony of the multiple victims, as well as the corroborating circumstances.

## VIII.–XI.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

[*]See footnote, *ante*, page 632.

## DISPOSITION

The judgment is affirmed.

We order correction of the abstract of judgment to reflect the total prison sentence imposed and not stayed is 10 years eight months. We direct the trial court to prepare an amended abstract of judgment and to forward a certified copy to the Department of Corrections and Rehabilitation.

Nicholson, Acting P. J., and Butz, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 29, 2009, S173274. Corrigan, J., did not participate therein.