[No. C054422. Third Dist. Mar. 5, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT KENNETH MEMORY et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts II. through IV. of the Discussion.

836

## Counsel

Christine Vento, under appointment by the Court of Appeal, for Defendant and Appellant Robert Kenneth Memory.

Charles M. Bonneau for Defendant and Appellant Frankie Prater.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Clara M. Levers, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**CANTIL-SAKAUYE, J.**—A fight broke out in the parking lot of a Stockton bar between a group of mostly large, very drunk young men and two members of the Jus Brothers motorcycle club, defendants Robert Kenneth Memory and Frankie Prater. When the fight ended and Memory, Prater, and

Prater's wife left on their motorcycles, two of the drunken group had been stabbed and a third young man, who had arrived during the fight, had been stabbed and killed.

Prater was convicted of second degree murder (Pen. Code, § 187) (count 1) with two weapon enhancements (Pen. Code, § 12022, subd. (b)). Memory was convicted of two counts of attempted voluntary manslaughter (Pen. Code, §§ 664, 192) (counts 2 & 3) with weapon enhancements (Pen. Code, § 12022, subd. (b)) and two counts of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)) (counts 4 & 5) with weapon and great bodily injury enhancements (Pen. Code, § 12022.7, subd. (a)).[1]

On appeal, both defendants raise numerous claims of error challenging evidentiary rulings and instructions and claiming prosecutorial and jury misconduct.

Both defendants contend the trial court erred in admitting prejudicial, gang-type evidence of the Jus Brothers motorcycle club, and the admission of that evidence denied them a fair trial. We find the trial court erred in admitting this evidence. There was no foundation that the Jus Brothers was a gang or a criminal enterprise; the evidence was not probative on motive, but instead was used to show defendants' criminal disposition; the limited probative value of the evidence to show identity and bias of certain witnesses could have been handled with considerably less evidence; and the evidence was inflammatory. Much of the evidence admitted, and argued by the prosecution, was inadmissible character evidence. The error in admitting this evidence was compounded by the prosecutor's argument linking the Jus Brothers to the notorious motorcycle gang, the Hells Angels.

As the trial court recognized, the defense in this case relied entirely on credibility determinations. Even the prosecution evidence conflicted as to what happened that night. Further, the jury was presented with numerous questions about not only what happened, but also what defendants perceived and the reasonableness of their belief in the need for self-defense or defense of others. This was not a case presenting a simple choice between guilty as charged or not guilty; the evidence would support various lesser offenses. The error in admitting irrelevant, inflammatory evidence harmed defendants' credibility and provided evidence of their criminal disposition such that,

---

[1] The People properly concede the abstract of judgment should be modified to strike the weapon enhancements (Pen. Code, § 12022, subd. (b)) on counts 4 and 5. (*People v. Summersville* (1995) 34 Cal.App.4th 1062, 1069–1070 [40 Cal.Rptr.2d 683].)

absent the error, it is reasonably probable they would have received a better result on all counts.

Memory also contends the evidence is insufficient to sustain his convictions. We agree only as to count 2, the attempted voluntary manslaughter of Jeremy Miller. While there was evidence Memory stabbed Miller, there was insufficient evidence he did so with a specific intent to kill.

We reverse counts 1 through 5. Retrial is barred on count 2.

## FACTS

The night of November 5, 2004, a group of young men, including five men in particular, Clifford Enos, Jeremy Miller, Derrick Scott, Justin Hood, and Jack Barton (also referred to as the Enos and Miller group), were at Shakers Bar in Stockton. The group had been drinking for several hours and was drunk. Enos was a short man; he was a hothead who started fights when intoxicated. The week before, he had been asked to leave Shakers for fighting. The other four men were much larger than Enos. Miller was six feet five inches tall and weighed 250 pounds. Scott and Barton weighed about 250 pounds each. Hood was five feet nine inches tall and weighed 180 to 190 pounds.

After the Enos and Miller group had been at the bar for a while, defendants Prater and Memory, and Prater's wife Teresa, entered. Prater and Memory were members of the Jus Brothers motorcycle club; they were wearing vests with the Jus Brothers patch. After a beer or two, the bikers left. Some of the young men, particularly Enos and Miller, followed them into the parking lot and began yelling at them. Someone told Memory to "have a white night."[2] Others told the bikers to "get the fuck out of here" or they would "beat their ass." Witnesses heard, "man to man with no weapons" and "my boys against you."

In response to the angry crowd, Memory pulled out a crescent wrench and Prater got a Maglite flashlight from his saddlebag. They later had knives. The confrontation continued; there were 15 to 25 people in the parking lot when Mark Donahue and his friends arrived. Donahue yelled at Teresa Prater. She called for Prater, who hit Donahue with the flashlight and then the two men

---

[2] The exact meaning of this expression is never explained. One witness testified a "white knight" is a White supremacist.

wrestled on the ground. A few moments later someone yelled, "he's got a knife." Miller and Scott both announced they had been stabbed. Donahue stood, staggered a few steps and fell; he had been stabbed. The bikers took off quickly. Donahue died hours later from shock and hemorrhage from the stab wound; he bled to death. Miller and Scott each suffered one stab wound.

These basic facts are undisputed. Witnesses gave varying accounts of the specifics surrounding the stabbings; some of their stories changed over time. Viewing the evidence in the light most favorable to the verdicts, as we must on appeal (*People v. Henning* (2009) 173 Cal.App.4th 632, 635 [92 Cal.Rptr.3d 775]), it is impossible to determine exactly what happened that night. We recount the varying specifics below.

*The Scene at Shakers*

Shakers Bar is located in a building with a Chinese restaurant. Across the street is a carwash. The bathroom is shared with the restaurant and accessed from outside. There is a very small parking lot, holding four or five cars. Bill Johnson, the owner, lives upstairs and monitors the activities of the bar with a closed-circuit television.

According to Jamie Whipp, the lone bartender, the crowd that night was rowdy, men who liked to drink. In addition to the Enos and Miller group, there was another group. This group knew defendants and included Riley Cox, Bill Walker, Josh Thrasher, and Josh's parents Hans and Cherie Knoepfle. Richard Bird joined this group for two hours; he left before the fighting. The Enos and Miller group was by the front door, "hooting and hollering" and having a good time. They tried to trip people when they went to use the bathroom. Hans Knoepfle was wearing a Harley-Davidson T-shirt. Hans told Bird he heard three or four of the rowdy group talking about bikers and how they were going to get them.

*Defendants Arrive*

Shortly before 11:00 p.m., Memory, Prater, and Teresa Prater arrived at the bar. Memory and Prater were wearing leather vests with Jus Brothers patches. They parked their two motorcycles directly in front of the bar. At the bar they kept to themselves. After a short time, they left and went out to their motorcycles. According to the bartender, Enos started arguing with the bikers in the bar and told her there was going to be a fight. Enos admitted he might

have said that. A lot of people followed the bikers outside to the parking lot. Barton claimed the bar cleared out.

*The Fight Starts*

Enos testified he told Memory to "have a nice night," possibly in a "smart ass" manner. Miller testified Enos actually said, "have a white knight" and Enos admitted someone said that. Memory got angry and said, "what did you fucking say?" Enos was yelling at Memory. Enos claimed the situation was "solved" and he and Memory shook hands. Whipp saw Enos challenging Memory with his fists up, bobbing and weaving like a boxer.

Miller was arguing with Prater. Miller was "pissed off" and told Prater to leave and he would "beat his ass." Prater did not try to leave. Some of Miller's friends were also outside; eventually they all were. Prater got out a Maglite flashlight. Miller said, "Let's sling.him," meaning "let's fight."

The bikers had been about to leave; several witnesses said the motorcycles, or at least one, were on. Others said the motorcycles were not on. The bikers had their helmets on. A customer out on the patio heard the motorcycle engines revving and her boyfriend thought they might be about to do tricks.

Cox, a young plumber who had met Prater a few times, claimed he was on the patio when he heard yelling. He went out to the parking lot and saw a group around Memory and Prater. Cox asked, "why don't you just let these guys ride home?" A guy brushed his arm away and said, "Do you want some, too?" The crowd was yelling and circling Memory. Someone said he wanted to fight. Cox told Prater he should leave; Prater did not leave, and the crowd closed in on him. There was a scuffle in the street and people jumped on Prater. It happened fast. Cox left the scene without talking to the police. He did not tell the police he saw Prater being beaten by six or seven men.

There was a great amount of yelling, with members of the Enos and Miller group arguing with the bikers. They were telling the bikers to leave. Some witnesses heard threats to kick over the motorcycles. Barton, part of the Enos and Miller group, said the bikers were commanded to leave, but would not follow orders. Miller told someone he would beat his ass. Barton yelled, "get the fuck out of here or you will get beat up" eight or 10 times.

The bikers did not try to leave. Memory pulled out a cell phone and made a call to a fellow Jus Brother to come to Shakers. Enos thought the phone was a gun and dove for cover behind a car. Whipp, the bartender, testified Memory pulled out a knife. At that point she went inside the bar and closed the door. She later testified Memory pulled out something blue about the size of a cell phone and she was not sure it was a knife. Enos may have told Memory to put the phone away or not to call friends.

## Stabbing of Miller and Scott

Memory then pulled out a crescent wrench from his vest. He waved it about, giving as much chase as the crowd. He swung the wrench at Scott, but did not hit him. Scott swung his jacket so he did not get hit. When the customer on the patio saw the bikers with weapons and heard someone say, "man to man with no weapons," she called 911.

According to Enos, two guys came at him from the carwash. They had knives and screwdrivers and circled him. Miller said Enos was fighting with friends of the bikers. Miller joined that altercation and was stabbed. Miller did not see who stabbed him. Scott also saw the two guys from the carwash. He said Memory and Miller squared off to fight and Memory stabbed Miller under the arm with a three-and-a-half-inch knife. Scott was getting ready to defend himself from the guys from the carwash when Memory ran behind Scott and stabbed him. Scott placed these events on the sidewalk. Barton, who did not see the actual stabbing, said Scott was in the crowd in the street. After Scott said, "He stabbed me," Miller said, "He got me too." Miller was stumbling around the middle of the road.

## Thrasher and Walker's Version

Thrasher and Walker, who knew defendants, were at Shakers earlier that evening. They left to go to other bars before the fight broke out. On their way home, they passed by Shakers and saw a group of 10 to 15 people around Memory and Prater in the parking lot. The group was large men; they were yelling, "Okieville" and "fuck you." Thrasher and Walker parked near the carwash and went to Memory's aid. Walker grabbed a screwdriver and put it in his pocket. He did not see Thrasher with a knife. A guy who had been fighting with Memory lunged at them with a knife. Walker pulled out his screwdriver. He and Thrasher tried to distract the man to keep him from stabbing them; the man chased them around. Walker and Thrasher backed up to their car, trying to get to a phone. The guy with the knife hit the door of the car with the knife. Pictures of the scratch on the car door were admitted into evidence.

Thrasher ran to his home nearby and returned with his brother. When he left, Memory and Prater were on the ground with several people hitting each

of them. When he returned Memory and Prater were gone. Thrasher did not tell the police he knew Memory or Prater or that he saw them being beaten. He also did not tell the police about the guy with a knife. Walker claimed he did not tell the police that night what had happened because a large man threatened "to beat the shit out of us." Walker identified the man with a knife as a short man, with scraggly hair wearing a grey sweater. He claimed he told the police about this man.

Bill Johnson, the bar owner, testified he saw Enos waving a knife that night. That night he told the police he thought it was a knife. Enos left and returned later. Enos admitted he took off running after the stabbings and called his cousin to pick him up. He returned later and the police threw him in a police car. Johnson claimed when Enos returned, he was wearing a different style shirt. Johnson told the police about Enos, but they were more interested in identifying the bikers. Johnson told the bartender not to talk to the police. One of the officers who responded that night called Johnson "anti-police."

*Stabbing of Donahue*

Mark Donahue was six feet four inches tall and weighed 200 pounds and in "very good shape." Friends described him as happy and docile when he drank. At 8:00 p.m. that night he visited his girlfriend at a restaurant where she worked and made plans to see her later. Later that night Donahue told her he was taking some underage friends to Shakers and he would meet her afterwards at Stockton Joe's.

Donahue joined a group of friends, including Brian Shirk and Richard Contreras, and went to Shakers.[3] When they arrived, there was a crowd in the parking lot; they heard angry shouting. Shirk described the confrontation as a large group against two bikers. He saw Memory being chased by and chasing two men, one of them short. Contreras told Donahue and Shirk they should all wait in the car until the confrontation was over, but the others thought it would end soon and continued towards the bar.

A group was arguing with Prater. Some witnesses claimed Miller was squared off with Prater. Others had several men against Prater. Shirk testified the group arguing with Prater spread out; each side was making advances, jumping back and forth, trying to make it known they meant business. Prater reached into his saddlebag and retrieved a Maglite flashlight. Pulling out the flashlight escalated the situation; the yelling got louder. Johnson, the bar

---

[3] Shirk and Contreras had not been drinking; they had taken their younger brothers to a movie.

owner, claimed Miller backed off Prater when Prater retrieved the flashlight, but Miller later took Prater down.

Miller described the situation as a "rumble"; the crowd was fighting. The customer on the patio saw a lot of pushing and shoving. Contreras said everyone was fighting, running and glancing blows at people. He said there were a lot of people "with shit in their hands."

According to Shirk, Teresa Prater squeezed between him and Donahue and in front of a pickup truck. As she brushed past Donahue, she pushed him forward. It was a violent shove; Donahue lunged forward. Contreras saw the woman glare at Donahue then walk behind him. Donahue looked around to see who pushed him. He yelled at Teresa, "What are you doing? I'm not part of this. I don't know you." Shirk told the police the woman looked completely harmless and she cowered when Donahue yelled at her. According to Contreras, Donahue said, "What the fuck? I don't even fuckin' know you. Why are you yelling at me?" Donahue backed up with his hands raised. Contreras told the police Donahue "went off" on Teresa. The customer on the patio remembered someone being pushed up against a truck; she thought it was a man.

Teresa yelled for Prater. Prater ran up with his flashlight and hit Donahue over the head. Prater and Donahue began wrestling and fell to the ground. Punches were thrown. Three to five others were kicking them and trying to pull them apart. Shirk told the police Prater looked like a cornered animal, a man defending himself. Prater said, "get off of me." Donahue said the same. Then someone yelled, "he's got a knife." Donahue tried to push himself up; he stumbled and fell in the street. Contreras ran over to help. He rolled Donahue over; he looked terrible, his teeth were broken and he was bleeding. Donahue's hand had a deep cut, as if he had grabbed the knife. It took Contreras a moment to recognize his best friend. The fight happened quickly; it was only a few minutes from when Donahue arrived until he was lying in the street.

The bikers took off very fast. When the bikers left, so did a blue Neon by the carwash.

*The Three Victims' Injuries*

Donahue was given CPR on the way to the hospital. He suffered respiratory and cardiac arrest. Donahue had substantial blood loss and was bleeding from the pulmonary artery. He survived surgery, but died at 3:25 a.m. There was a deep slash, a defensive wound, to his left palm. His upper front teeth were knocked out. Lacerations to his head were made by a blunt instrument

and consistent with a Maglite. The injuries to his face were not consistent with a single fall. His blood-alcohol level was 0.12 percent, and there was a small amount of benzodiazepine or Valium.

Scott had been stabbed on the left side under his arm. He had a one-inch-wide incision below his shoulder. On the way to the hospital he complained of shortness of breath. He had a hemothorax, blood between his lung and chest cavity; doctors performed surgery to determine if there was injury to his diaphragm. Scott was in the hospital five days with a punctured lung. His blood-alcohol level was 0.13 percent at 12:46 a.m.

A paramedic treated Miller as he sat on the curb. He was bleeding from the left armpit area. Someone had already placed a bandage on Miller. The paramedic offered aggressive treatment he did not really think necessary: a pressure bandage with Vaseline gauze to create a seal. The report indicated Miller had a one- to two-inch laceration in the armpit area. Miller's vital signs were stable. Miller was aggressive and under the influence. Miller did not want to go in the ambulance; he did not think he was hurt and wanted to avoid "the $1,000 ride." He received stitches at the hospital and later had to be restitched. He missed a month of work.

*Law Enforcement Response and Investigation*

When the police responded, Donahue was lying in the street unresponsive. Whipp told them, "Don't let him die. . . . I know who did it." She identified Enos as the "short, crazy guy."

Enos was agitated; he smelled of alcohol and was put in a patrol car. Miller was intoxicated several hours later, but cooperative. Johnson would not identify the bikers; he was adamant in placing the focus on Enos and Miller. Scott was interviewed four days later in the hospital.

The police did not find any weapons at the scene. They found two pairs of glasses on the ground. Johnson pointed out one pair of glasses; he claimed they flew off Memory when he was tackled.

A description of the suspects was broadcast. The suspects were two White males, late 30's to 40's, with longish hair and facial hair, goatees and mustaches. One wore glasses. There was also a White female in her early 40's with long hair in a ponytail and dark clothing. The males wore Jus Brothers vests or jackets. Eddie Nieves, the sergeant at arms for the Jus Brothers, was stopped on his motorcycle nearby. He later told the police he had received a call, "they're on us." Witnesses could not identify him as one of the bikers.

Enos gave the police pictures he downloaded from the Jus Brothers Web site. Heather Ewing was originally identified as the female and the Ewings were arrested. Memory and Prater were identified from a group photo found at the Ewings' house. The police received an anonymous call telling them to "look at Frankie."

Neither Memory nor Prater contacted the police that night. No Jus Brother called the police to identify Memory or Prater in the days following, even after the Ewings were arrested. Four days later, on the 8th of November, 2004, the police received word that Prater would turn himself in. He did on the 11th, without making a statement. Memory turned himself in the next day. Both were clean shaven, with short hair.

A search of Memory's residence revealed pictures of the Jus Brothers and a Jus Brothers belt in a safe. Many knives were found, as well as Maglites and wrenches. A defense objection to admitting all the knives was overruled.

When the police searched Prater's house they found pictures spread out on a table showing injuries to Prater and his wife. Prater later testified he believed the injuries were worse than shown in the pictures. A lot of knives were seized. None of the knives were found to have blood on them. The police took pictures of various knives and a black Maglite.

The police obtained cell phone records for Prater, Memory, and other members of the Jus Brothers. These records showed numerous phone calls among various Jus Brothers immediately after the incident, continuing through the next day. Memory called Nieves during the incident. Nieves called a friend that night to say he would be late because he had to go to Shakers.

*Defense Case*

Prater's dentist testified he saw Prater the following spring after he was released from jail. Prater's teeth were broken and Prater explained he had been kicked in a scuffle. The dentist performed three root canals and opined the cause of the problem was trauma.

The defense called several of defendants' friends who were at Shakers that night. They testified the rowdy crowd near the front door was rude, tripping people on their way to the bathroom. They described the crowd as "sizing them up" and "looking for trouble." Hans Knoepfle testified the crowd said they would get the bikers out of their bar.

A police officer testified he took a statement from Scott that night. Scott claimed he was a bystander and not involved in the altercation. Scott did not

report he saw Miller stabbed. Another officer testified Barton told the police three bikers rode up, called out patrons of the bar—"come on motherfuckers"—and stabbed them. Contreras told a detective "everyone was getting on these two dudes." "They started circling the other guy, and that's when all hell broke loose."

Both defendants testified. Prater owned a business called Arctic Heating and Air Conditioning. The night of the stabbings he had a late dinner with his wife and Memory. After dinner, they stopped at Shakers. They had a beer and then went outside to smoke a joint. Scott was swinging a metal cable near the motorcycles. Memory asked him not to and Scott said okay. They went back inside the bar.

Prater ordered another beer and Miller came up behind and gestured like "that's nothing." The music was louder and the group by the jukebox was slam dancing, so Memory and the Praters decided to leave. As they were getting ready to go, Enos yelled at Memory, "Have a white night." Memory replied, "Man, we don't want no problems."

Scott came up with his jacket with the cable in it and said, "We're gonna kick your fuckin' ass." Memory pulled out his phone. Enos, Scott, and Barton were confronting Memory, "Aren't you white? Me and you out in the street. . . . I want to kick your ass." Teresa asked the crowd to let them leave and one yelled, "Bitch, I'll kick your ass right now." Enos ran up with a knife and Memory yelled into the phone, "Help, I'm at Shakers being jumped." Enos lunged with the knife. Thrasher came up and Enos took off after him.

The crowd was threatening to kick the motorcycles over. Miller asked to shake Prater's hand, but Prater thought it was a ruse. Miller boasted he had 15 boys right now. People were cutting off Miller and Prater thought he could not leave.

Prater heard Teresa yell, "Frankie." A big guy had her by the arms and slung her over. The guy told Teresa, "Bitch, I'll kick your ass." Guys were swinging at Prater, who knew his wife had a medical condition and could pass out. The big guy shoved Teresa into a truck and went after Prater. Prater hit Donahue (the big guy) with a flashlight to no effect. Prater was thrown to the ground and lost his helmet. Donahue was on top of Prater hitting him, while others kicked him. Prater found his knife and opened it. Donahue grabbed Prater's hand with the knife and started to press down. Prater twisted and Donahue jumped up and began to run. Then Donahue fell. Prater pulled out his knife to get Donahue off of him, not to kill him.

Prater jumped up and told Teresa to get on the motorcycle. Enos ran up with a knife and threatened them. Prater jumped on the motorcycle and left. He lost the knife on the freeway and threw his vest on the side of the road.

Meanwhile, Memory got hit and stumbled. People were hitting him on his back and on the back of his head. He was dragged backwards; Miller had his right arm and Barton his left. Enos ran up with a knife and stabbed Miller. Memory thought he was going to die. He pulled out an X-ACTO utility knife. Scott swung the cable and Memory swung the knife. Memory stabbed Scott in the arm; later he learned it was in the back. Memory heard Prater leave and he split. He threw his knife away.

The next day Memory and Prater were both too sore to get out of bed. When they heard someone had died, they realized they needed legal representation and sought attorneys.

Prater had joined the Jus Brothers for camaraderie and to ride his motorcycle more. He did not wear a "1%er" patch. Memory liked being a member of a club. He admitted he was a "1%er."

## DISCUSSION

### I.

### The Trial Court Erred in Admitting Evidence of the Jus Brothers Motorcycle Club as a Gang

Defendants contend the trial court erred in admitting irrelevant and prejudicial evidence of their membership in the Jus Brothers motorcycle club. The Attorney General contends defendants forfeited this contention by failing to object below and the evidence was admissible to rebut defendants' claims of self-defense and to establish their mental states.

*Pretrial Motions*

Prior to trial the defense filed an in limine motion to prevent the prosecution from referring to the Jus Brothers as an outlaw motorcycle club. The motion argued the use of the term "outlaw" connoted illegal criminal activity and was prejudicial. The motion urged the court not to permit expert testimony about the code of conduct of the club. It argued evidence of defendants' membership in the motorcycle club was irrelevant.

In response, the People filed a motion to allow expert testimony on the Jus Brothers motorcycle club to prove identification, motive, and aiding and

abetting.[4] "This jury should be allowed to see the full picture of who these defendants and the Jus Brothers are and then decide if the defendants were helpless victims or men who jointly engaged in assaultive conduct." The People argued evidence of the club and its code of conduct was relevant to motive and aiding and abetting. The Jus Brothers "will not back down from a[n] altercation and will do <u>whatever it takes</u>, pursuant to their code, to preserve their pride and honor." The People proposed a limiting instruction that evidence of membership was admitted for the limited purpose of showing identity, possible motive and aiding and abetting.

The defense filed a supplemental brief, arguing the gang-type evidence did not meet the standards of the *Kelly/Frye* (*People v. Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240]; *Frye v. U.S.* (D.C. Cir. 1923) 54 U.S. App.D.C. 46 [293 Fed. 1013]) line of cases in light of *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579 [125 L.Ed.2d 469, 113 S.Ct. 2786].

The People responded that expert testimony on the motorcycle club was not subject to *Kelly/Frye* and was not improper psychological evidence. The People argued club membership rebutted defendants' claim of self-defense. "They have great pride and respect in their colors and proudly proclaim a one percent lifestyle. In the one percent lifestyle you carry knives, wrenches and mag-lites which can be used as weapons. You do not let anyone disrespect you. Your first loyalty is to the club and you act in a manner that does not disgrace the club. A member will not back [down] and a brother will back another brother. It[']s different from any other member of society where it's left up to the individual."

*Evidence Code Section 402 Hearing*

The trial court held a hearing under Evidence Code section 402 on the admissibility of evidence of the Jus Brothers motorcycle club. David Bertocchini, an investigator for the district attorney's office assigned to gangs, testified as an expert. He explained a "1%er" patch indicated an outlaw motorcycle gang. The idea of the "1%er" arose after a 1947 incident involving motorcyclists in Hollister. There was a mini-riot which generated bad press. In an attempt to distance themselves from the incident, the American Motorcycle Association responded by proclaiming 99 percent of motorcyclists were law abiding. Outlaw motorcyclists then claimed to be 1 percent. According to Bertocchini, outlaw motorcycle clubs did not call themselves gangs because they worried about being prosecuted under Penal Code section 186.22, but they were very active in criminal behavior.

---

[4] Each defendant was charged with all the crimes on a theory each aided and abetted the other. The jury rejected this theory, acquitting defendants of the crimes in which they were not directly involved.

Bertocchini testified the Jus Brothers began in the 1990's as a family club but gradually changed to an outlaw motorcycle club. They associated with the Hells Angels and wore a red-and-white patch supporting the Hells Angels. The Hells Angels, the dominant outlaw gang, gave the Jus Brothers permission to exist. Gaining membership in the Jus Brothers was difficult. First, one had to hang around for a few months, then be sponsored by a member; after a period of time and eight runs, one could become a full member.

The club patch was a prized possession to be protected at all costs. The patch belonged to the club; if one left or got kicked out, the patch went back to the club. It was sacred. Serving time in prison did not affect membership. The club was male only and had no Blacks.

There were charges pending against certain Jus Brothers for cultivation of marijuana, weapons violations and child abuse. Jus Brothers were known to carry knives. There was an incident at Koe's Bar where a Jus Brother hit someone with a wrench. Bertocchini testified Jus Brothers engaged in underlying criminal activity that benefitted the club. He suggested a Jus Brother could deal drugs, knowing no one would inform on him because of retaliation. He admitted, however, there were no current prosecutions for Jus Brothers dealing drugs.

Outlaw motorcycle clubs distinguished themselves from other motorcycle clubs because their primary purpose was commitment to the club, loyalty and brotherhood. Bertocchini opined that Jus Brothers were an outlaw motorcycle club due to their criminal activity, their support for the Hells Angels, the "1%er" patch they wore and their lifestyle. A Jus Brother would be expected to retaliate if someone disrespected his colors and to help a fellow Jus Brother. Bertocchini claimed this incident benefitted the Jus Brothers because it gave them the image of not backing down. The code of not backing down was similar to that of prison gangs and Norteños and Sureños, but Bertocchini could not give an example of a Jus Brother being beaten for failing to back someone up.

Bertocchini testified all Jus Brothers were outlaws, even those who had jobs and paid taxes. The 1-percent lifestyle required them to act in certain situations or lose face. He admitted he did not know if either Memory or Prater wore a "1%er" patch.

The California Department of Justice defined an outlaw motorcycle gang as an organization that utilized its motorcycle affiliation as a conduit for criminal enterprises. When asked what criminal enterprises the Jus Brothers engaged in, Bertocchini said some clubs were less sophisticated than others. He testified the Jus Brothers utilized their motorcycle affiliation as a conduit for

criminal enterprises; their criminal enterprises "could be anything from drug dealing to witness intimidation to guns." He gave no examples of any Jus Brother committing these crimes.

Fred Hess, a veteran who served in Iraq, was a member of the Jus Brothers. He testified it was a family club; its motto was family first, job second, brotherhood third. He disagreed the Jus Brothers was a criminal organization; the club did not condone criminal activity. In the last six months the Jus Brothers claimed 1 percent status; it meant they were different, not an outlaw motorcycle club. Hess wore a Hells Angels support patch in memory of a childhood friend. He testified he would not back a brother who was lying, stealing or doing drugs.

At the conclusion of the hearing, the trial court told the prosecutor it was a weak case for an expert. There was no gang allegation and no evidence the primary purpose of the club was criminal activity; there was no evidence of predicate offenses. Bertocchini's testimony was psychological and there was no evidence of his qualifications in that realm.

The motions were subsequently argued. The defense argued there would be overwhelming prejudice if this evidence was admitted. There was no evidentiary support for the assertion of retaliation if a Jus Brother was disrespected and no evidence either Memory or Prater wore a "1%er" patch. The defense asserted that admitting the evidence would violate due process and freedom of association. For purposes of identity, however, only that defendants wore Jus Brothers jackets needed to be admitted. The defense argued the prosecutor was attempting to introduce character evidence and there was no foundation to establish Jus Brothers were criminals. The expert witness could not say the Jus Brothers were engaged in a criminal enterprise as required by the Department of Justice's definition; he ignored that standard and created his own. Although the prosecution argued the evidence showed motive, it failed to identify the motive. The defense asserted the motive was two people threatened by 15. According to the defense, admitting the evidence would result in an unfair trial; it would also consume time and confuse the issues.

The prosecutor argued gang evidence was admissible to show motive, intent, and aiding and abetting. He argued the jury should hear both sides of what happened that night. "Was this two Jus Brothers only trying to protect themselves? Or were these two people that were yelled at by a bunch of young drinking kids and were told to get on their bikes and leave, took that as an affront to their colors, and decided that they would take care of some business?" The prosecutor's purpose was not to show the crimes Jus Brothers committed, but intent, motive, and identity.

*The Ruling*

The court found Bertocchini qualified as an expert, but he would not be allowed to testify. The court found the evidence relevant, especially as to motive, but the court had to determine if the evidence was more prejudicial than probative. In *People v. Beyea* (1974) 38 Cal.App.3d 176 [113 Cal.Rptr. 254], the People were allowed to refer to the defendants' membership in the Hells Angels to show motive, but the Jus Brothers had not risen to the level of the Hells Angels as a gang. It was common knowledge that gang members or motorcycle club members were held in low regard. Since the credibility of defendants was the key to the defense, the court found evidence from a gang expert more prejudicial than probative.

The court intended, however, to grant the prosecutor "a ton of latitude" in cross-examination. The court ruled that the prosecutor could call members of the Jus Brothers and have them declared hostile witnesses. Bertocchini's opinion that the Jus Brothers was a criminal enterprise was not supported, but the rest of his testimony could come in through other witnesses. The prosecutor was given "great latitude" to ask about membership in the Jus Brothers, backing each other up, what 1 percent means and "[p]retty much everything Bertocchini testified to" except the ultimate opinion that their main purpose was a criminal enterprise.

*Evidence and Argument Concerning the Jus Brothers at Trial*

In opening statement, the prosecutor told the jury defendants showed up at the bar on their Harley-Davidson motorcycles wearing their leathers with the Jus Brothers patch. "So these defendants are members of what they refer to as an outlaw motorcycle group called Jus Brothers. You need to know a little bit about Jus Brothers. Jus Brothers is what we call a one-percent club. One-percenters—and we'll have Jus Brothers testify and they'll tell you this. One-percenters call themselves one-percenters because they are different than 99 percent of the public. Two things they take great pride and respect in: Their patch or their colors, and another Brother.

"Now what they'll tell you about why they are different—and this was even on their website. And they talk about being a warrior. And on their website they had if you have a hundred men, ninety percent—ninety of them aren't worth anything. Ninety percent of them, they are needed, they make the battle. But one percent, the one-percent man is a warrior."[5]

---

[5] "The Warrior Spirit" from the Jus Brothers Web site is a quotation attributed to Heracleitus, circa 500 B.C. "Of every *One-Hundred* men, Ten shouldn't even be there. Eighty are nothing but targets. Nine are real fighters. We are lucky to have them. They make the battle. Ah, but the ONE. *One* of them is a Warrior. and He will bring the others back."

The prosecutor talked about the colors belonging to the club and that it was a tight-knit group. The Jus Brothers held fund-raisers for defendants and several put their homes up as collateral for bail.

The prosecutor continued, "And to be a one-percenter in this area, you have to be a supporter of the Hell's Angels. And many of them will wear the support patch of the Hell's Angels. And they'll tell you, Hell's Angels are the dominant club in this area. And they exist with their blessing."

Memory moved for a mistrial, claiming the assertion of a connection between the Jus Brothers and the Hells Angels violated the court's ruling. In addition, there were discovery violations. The trial court denied the motion, finding no violation of the ruling.

After the police and medical personnel who responded to the scene testified, the People called two members of the Jus Brothers to testify about their motorcycle club. The first was Eddie Nieves, a 52-year-old custom fireplace builder. Nieves had an extensive criminal history; he could not remember all his convictions and he had been in prison for four years. He had been a member of the Jus Brothers for six years and had no convictions since joining. He explained he joined the club by first being a "hang around" for three months and then a prospect for nine months. When Nieves could not or would not answer how many members the Jus Brothers had and other questions, the court indicated he could be declared a hostile witness. Later, Memory complained about the court's remarks, and the trial court stated it would declare Nieves a hostile witness "in a hot second" because he was uncooperative.

Nieves testified the Jus Brothers was a family-oriented club; it held functions for the blind, the needy and the homeless. Jus Brothers claimed 1 percent, but it had nothing to do with being outlaws. Nieves was proud of the club because of what it did and how it had helped him. "If it wasn't for these Brothers, I would probably be back on skid row, probably be out there doing drugs. These Brothers helped me out." Nieves testified it was family first, then job, then Brothers.

The defense objected to questions about things on the Jus Brothers Web site because Nieves did not use a computer. The court complained about defense objections that questions were broad, vague, and leading. The court was giving the district attorney a lot of leeway to bring out evidence about "1%ers" and how they act. The defense responded it did not understand that Evidence Code section 352 would be relaxed and it was "outrageous" the jury had yet to hear from a percipient witness. The defense objected on relevance grounds to the admission of old photographs taken off the Web site,

including one showing a knife in a tree. The court pointed out that its earlier ruling excluding the expert contained a condition of giving the prosecutor "wide latitude" to connect the Jus Brothers to his case. "And part of his case appears to be that they ride motorcycles and they are an outlaw gang and they have knives. And this is a stabbing. And there are three stabbings so we—I don't think you can have it both ways. I don't think you can not have the expert get on the stand and testify, and then also ask that he not be able to have wide latitude. It's either one or the other." The court also overruled relevance and foundation objections to pictures of Jus Brothers vests with Hells Angels support patches that were from a Shasta chapter of the club.

Nieves was asked about the Web site and what it said about the warrior spirit. He was also asked about a statement that read, "Some claim we're as hard as the bikes we ride. It said we have outlaw ways. Some paint us as crude as they possibly can because that's the picture that pays. But the brothers all know better. We know each other best. And since we're all that matters, who cares about the rest."

Nieves was questioned extensively about disrespecting the patch. He was also questioned about calls from Memory and calls to other Jus Brothers the night of the stabbings.

Bobby Riley, a 71-year-old retired carpenter, bartender and truckdriver, was the president of the Stockton chapter of the Jus Brothers. He testified Jus Brothers were not supporters of Hells Angels, but went to their functions. He wore a support patch given to him by a good friend who had since passed away. The Web site had links to the Hells Angels. The Jus Brothers claimed a 1 percent lifestyle which meant they were not ordinary bikers. Riley would expect a Jus Brother to back up another Jus Brother.

Riley was questioned about various Jus Brothers who had been arrested. He was asked about a guy named Cornbread and a fight at Koe's Bar, as well as a fight in Marysville. Memory later objected that these questions violated the in limine order finding evidence of criminal activity by others was highly prejudicial. The court claimed the parties had compromised to exclude the expert, but allow the prosecutor wide latitude. According to the court, there was no objection from the defense about that ruling, but now the defense was making "disingenuous objections about evidence and the Evidence Code not being complied with, you can't have it both ways." Defense counsel indicated she understood wide latitude, "[a]lthough, I—I don't think that is proper and we still have our objections to that." The defense continued to complain about having to defend against actions by Jus Brothers other than their clients.

The defense called Mark Ewing, the vice-president of the Jus Brothers. He testified it was a family club about motorcycles and camaraderie. It was a social club; wives and children attended the events. The Jus Brothers were not officially approved by the American Motorcycle Association. Ewing explained after the "ruckus" in Hollister in the late 1940's, AMA banned certain clubs; these clubs broke off and were called "outlaw clubs." Eventually they formed the Modified American Motorcycle Association, which is basically a legislative lobbyist for bikers' rights. Ewing testified Los Carnales was a three-piece outlaw club consisting of police officers. The term "outlaw" had historical significance; it did not refer to criminal activity.

Some Jus Brothers claimed 1 percent and began wearing the "1%er" patch a few years ago. Ewing denied the club was engaged in criminal enterprises.

Counsel for Memory wanted to ask Ewing the occupations of various Jus Brothers to counter the prosecution's questions about members' names; she wanted to show the members were working men. The court sustained the prosecutor's objection unless the person had testified. Later, the court reversed its ruling and permitted Ewing to testify about the members' occupations.

In closing argument, the prosecutor sarcastically referred to defendants just happening to have deadly weapons with them. "Never mind the fact that we're Jus Brothers. Never mind the fact we support [the] Hell's Angels. . . . We just happen to have crescent wrenches in our coat pockets." "Just so happens I have a knife not because I'm a Jus Brother, not because we carry knives, but I just happen to have this little knife that I've got at Wal-Mart three days ago."

In discussing aiding and abetting, the prosecutor used an example of a gang case. Four Sureños are driving around and see a Norteño walking through their neighborhood; they decide to beat him and the Norteño dies. Maybe one Sureño pulled out a gun or a knife; all are guilty of murder. The jury had to decide about these defendants. "We know they are both Jus Brothers. We put on stuff about Jus Brothers. We know how they acted. We know how they behaved. They were both there together. They were both wearing their colors. . . . [¶] So you will have to decide if this is all aiding and abetting or if this is just an independent whoever would have thought this would happen kind of thing."

Near the end of argument, the prosecutor returned to the topic of the Jus Brothers. "Well, before the incident these guys are Jus Brothers. And you know about their code and what they are about. And you know they are carrying knives, not just when they are going camping. You know it's not a surprise for them to have a knife. And during the incident, they are—they are

backing each other up. That's what—that's what teammates do. That's what one-percenters do. That's what the warrior spirit is all about. Only one percent can be a warrior. That's the kind of people they are. They are not runners. They are not old men who can't take care of themselves. They are proud of who they are. They are proud of their reputation."

During rebuttal, the prosecutor argued the court had ruled the evidence about the Jus Brothers could come in; he did not put it on just to morally offend the jury. He dismissed the defense attempt to compare the Jus Brothers to the law enforcement club Los Carnales, which had a picture of a Hells Angel on its Web site. "Jus Brothers wear red-and-white support for Hell's Angels. They wear the 81 patch, which we went through, HA. They have links to Hell's Angels['] sites. When Rebel Riley was served his sub, he was on his way to a Hell's Angels' crab feed. Jus Brothers are one-percenters. They are nothing like police officers' motorcycle clubs. And you know what, it would be an honor for them to be compared to Hell's Angels and you all know that."

The court gave the following limiting instruction: "Evidence regarding alleged arrests, convictions, and/or misconduct on the part of other members of the Jus Brothers Motorcycle Club, who are not currently charged in this case, is not evidence for you to consider against defendants Frank Prater and/or Robert Memory for the purpose of proving the likelihood that these defendants committed the crimes for which they are charged."

In his motion for a new trial, Memory objected to the introduction of irrelevant evidence about the Jus Brothers motorcycle club. Prater joined in the motion. The People argued the Jus Brothers evidence was properly before the jury. The trial court denied the motion.

*Forfeiture/Waiver*

The Attorney General contends defendants have forfeited their contentions about the improper admission of evidence about the Jus Brothers because they did not object when such evidence was offered at trial. (See Evid. Code, § 353, subd. (a).) He concedes the defendants preserved their contention such evidence was irrelevant because they raised that point in a motion for a new trial.[6]

■ Defendants are challenging the trial court's in limine ruling that permitted the admission of the Jus Brothers evidence. "A properly directed

---

[6] Raising an evidentiary issue only belatedly in a motion for a new trial does not preserve the issue for appeal. (*People v. Borba* (1980) 110 Cal.App.3d 989, 994 [168 Cal.Rptr. 305] ["A motion for new trial may be made only on the statutory grounds; Penal Code section 1181 itself provides that '[T]he court may . . . grant a new trial, in the following cases only:' One of the statutory grounds is '5. When the court . . . has erred in the decision of any question of law arising during the course of the trial . . .' "].)

motion *in limine* may satisfy the requirements of Evidence Code section 353 and preserve objections for appeal. [Citation.] However, the proponent must secure an express ruling from the court. [Citation.]" (*People v. Ramos* (1997) 15 Cal.4th 1133, 1171 [64 Cal.Rptr.2d 892, 938 P.2d 950].) Before the court ruled, defendants raised numerous objections to admission of the evidence: that it was prejudicial and irrelevant; that there was no evidentiary support or foundation for some of the expert's conclusions, particularly that the Jus Brothers was a criminal enterprise; that admission of the evidence would violate due process and freedom of association; and that it would result in an unfair trial, consume undue time and confuse the issues. As the evidence came in, defendants objected at times, beginning with the prosecutor's linking the Jus Brothers to the Hells Angels in opening statement, proceeding to various objections during the testimony of Nieves and Riley, and culminating in the motion for a new trial.

The trial court complained about the objections, asserting defendants had compromised on the issue; the expert would be excluded in exchange for granting the prosecutor wide latitude in presenting evidence about the Jus Brothers. The record does not support finding there was a compromise by the parties on this issue; the compromise was by the court not the parties. A lengthy contested hearing was held on the admissibility of evidence about the Jus Brothers motorcycle club. The trial court then ruled, excluding the expert but permitting the prosecutor wide latitude to introduce "pretty much everything Bertocchini testified to" except his ultimate opinion that the Jus Brothers' main purpose was a criminal enterprise.

While a party will forfeit a claim by failure to obtain a ruling (*People v. Crabtree* (2009) 169 Cal.App.4th 1293, 1319 [88 Cal.Rptr.3d 41]), we are aware of no authority—and the Attorney General cites none—that requires a party to continue to object to the court's ruling after a contested hearing to preserve the issue for appeal.[7] (See *People v. Clark* (1992) 3 Cal.4th 41, 119 [10 Cal.Rptr.2d 554, 833 P.2d 561] [defendant not entitled to new hearing during trial on evidentiary issue ruled upon before trial].)

In a supplemental brief, Memory argues counsel's pretrial statements that the prosecutor could make the argument it was two guys protecting each other and that she was "fine" with the ruling should not be construed as waiving the argument. If the statements are so construed, Memory asserts counsel was ineffective. The Attorney General agrees these comments were "innocuous remarks" that did not constitute a waiver. We conclude the defense properly preserved the issue for appeal.

---

[7] In responding to defense objections about admission of evidence about the fight at Koe's, the trial court stated there was no objection to its ruling granting the prosecutor wide latitude, "not a word. [¶] . . . [¶] [Y]ou guys did not object one time . . . ."

*Analysis*

On appeal, we review the trial court's rulings concerning the admissibility of the evidence for abuse of discretion. (*People v. Thornton* (2007) 41 Cal.4th 391, 444–445 [61 Cal.Rptr.3d 461, 161 P.3d 3].) " ' "The trial court has broad discretion in determining the relevance of evidence [citations] but lacks discretion to admit irrelevant evidence." ' " (*People v. Carter* (2005) 36 Cal.4th 1114, 1166–1167 [32 Cal.Rptr.3d 759, 117 P.3d 476].)

The trial court allowed the admission of evidence about the Jus Brothers' culture and organization, the concept of "1%ers" and the warrior spirit, the Jus Brothers' support for Hells Angels and criminal activity by certain members of the Jus Brothers. Where the People were unable to introduce evidence on these topics because none of the Jus Brothers called as witnesses testified as the expert had, the trial court nevertheless allowed the prosecutor to argue and insinuate as if such evidence had been admitted. The effect was to admit the expert's opinion on these aspects of the Jus Brothers without actual testimony. We consider whether admission of this evidence, either by testimony or simply by argument and insinuation, was an abuse of discretion.

■ Only relevant evidence is admissible. (Evid. Code, § 350.) At trial, the People argued that the Jus Brothers evidence was relevant to prove identity, motive, intent and aiding and abetting. On appeal the Attorney General urges the evidence was admissible to rebut defendants' claims of self-defense and to prove defendants' mental states.

That defendants were members of the Jus Brothers was relevant to identity. Identity, however, was not disputed, and admission of only the fact that defendants were wearing vests with the Jus Brothers patch that night was necessary on this issue.

■ The trial court found the Jus Brothers evidence especially relevant to motive. "Gang evidence is relevant and admissible when the very reason for the underlying crime, that is the motive, is gang related. [Citation.]" (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167 [91 Cal.Rptr.3d 874].) There is not the usual gang motive here, such as criminal activity against a rival (*People v. Funes* (1994) 23 Cal.App.4th 1506, 1517 [28 Cal.Rptr.2d 758]) or a suspected rival (*People v. Williams* (1997) 16 Cal.4th 153, 193–194 [66 Cal.Rptr.2d 123, 940 P.2d 710]); a battle over gang territory (*People v. Sandoval* (1992) 4 Cal.4th 155, 175 [14 Cal.Rptr.2d 342, 841 P.2d 862]; *People v. Frausto* (1982) 135 Cal.App.3d 129, 141 [185 Cal.Rptr. 314]); retaliation for a prior attack upon a gang member (*People v. Zermeno* (1999) 21 Cal.4th 927, 930 [89 Cal.Rptr.2d 863, 986 P.2d 196]); intimidation preceded by gang signs and identification (*People v. Villegas* (2001) 92

Cal.App.4th 1217, 1222, 1227 [113 Cal.Rptr.2d 1]); or bolstering one's reputation within the gang (*People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1208 [105 Cal.Rptr.2d 187]).

Rather, the People offered the Jus Brothers evidence to prove that, because defendants were Jus Brothers, they were required to fight when challenged, to not back down, and to carry knives. The Attorney General explains: "Appellants' membership in the club, the fact that Memory was a one-percenter, and the fact appellants were wearing club colors on the night in question tended to prove that, at the time of the offenses, they were conforming to the club's practices. Thus, the evidence was relevant and probative of material facts, appellants' mental states." (Fn. omitted.) The problem with this argument is that there was no evidence of such a club practice.

■ "Gang evidence should not be admitted at trial where its sole relevance is to show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense." (*People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1449 [69 Cal.Rptr.2d 16].) With exceptions not applicable here, "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).) "Evidence of gang membership may not be introduced, as it was here, to prove intent or culpability. [Citations.]" (*Kennedy v. Lockyer* (9th Cir. 2004) 379 F.3d 1041, 1055.)

Although couched in terms of motive and intent, the People offered evidence of the Jus Brothers attempting to show defendants had a criminal disposition to fight with deadly force when confronted, but there was no evidence of this disposition. Apart from the prosecutor's questions and argument, there was no testimony that defendants had a disposition to fight with deadly force when confronted. The trial court abused its discretion in admitting this evidence. "Membership in an organization does not lead reasonably to any inference as to the conduct of a member on a given occasion. Hence, the evidence was not relevant. It allowed, on the contrary, *unreasonable* inferences to be made by the trier of fact that the [defendant] was guilty of the offense on the theory of 'guilt by association.' " (*In re Wing Y.* (1977) 67 Cal.App.3d 69, 79 [136 Cal.Rptr. 390], original italics.)

The Attorney General, as did the trial court, relies on *People v. Beyea, supra,* 38 Cal.App.3d 176, which found no error in the admission of evidence of the defendants' membership in the Hells Angels. In *Beyea,* when the victim was introduced to one of the defendants, that defendant shook his hand and said, " 'That's a Nigger's handshake.' " The victim replied, " 'I'm no Nigger.' " They argued and fought. The second defendant entered and joined the

fight against the victim. (*Id.* at p. 186.) The fight continued, with the defendants kicking the victim, demanding to know his true name and threatening him. After the defendants left, others tried unsuccessfully to revive the victim, who died. (*Id.* at p. 187.) Although noting the popular prejudice against the Hells Angels, the appellate court found no error in admitting evidence of the defendants' membership to prove identity (Beyea was wearing Hells Angels "colors") and motive (presumably a racial animus). (*Id.* at p. 195.) The trial court had screened prospective jurors for prejudice against the group during voir dire, a procedure also necessary because a newspaper article about the case referred to Hells Angels. (*Ibid.*)

We find *Beyea* distinguishable. In *Beyea*, the evidence about the defendants' membership in a motorcycle gang was considerably less than the evidence in this case. There the evidence was admitted to show identity. Here defendants had no objection to the admission of limited evidence that they wore Jus Brothers vests to show identity. In *Beyea*, the evidence was also admitted to show motive—to explain an otherwise inexplicable attack. Here, by contrast, the Jus Brothers evidence was admitted to show defendants' criminal disposition when confronted by others.

█ The trial court noted the Jus Brothers had not risen to the level of the Hells Angels. Indeed, evidence of the Jus Brothers motorcycle club did not meet the foundation requirements for admission of criminal gang evidence. The requirements of Penal Code section 186.22, subdivision (f) were not met as there was no evidence the primary activities of the Jus Brothers were the commission of criminal acts enumerated in Penal Code section 186.22, subdivision (e). Nor did the Jus Brothers meet the definition of an outlaw motorcycle gang, as testified to by the prosecution expert Bertocchini. There was no evidence the Jus Brothers utilized its motorcycle affiliation as a conduit for criminal enterprises. Tellingly, no gang enhancements were alleged. "In cases *not* involving the gang enhancement, we have held that evidence of gang membership is potentially prejudicial and should not be admitted if its probative value is minimal. [Citation.]" (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 [16 Cal.Rptr.3d 880, 94 P.3d 1080].)

The trial court recognized the lack of evidence regarding the criminal nature of the Jus Brothers and properly excluded expert opinion that the Jus Brothers was a criminal gang. The court also excluded expert testimony as to other aspects of the club, finding it too prejudicial, particularly as to credibility. The prosecutor was allowed, nonetheless, to attempt to introduce "[p]retty much everything Bertocchini testified to" through other witnesses and argue the Jus Brothers' and defendants' criminal dispositions.

The Attorney General argues the Jus Brothers evidence "was not the typical, inflammatory gang evidence . . . ." We disagree that it was not

inflammatory. The prosecutor sought through its opening statement, structure of its case-in-chief, examination of witnesses, and in closing arguments, to continually portray defendants as members of a violent "1%er" outlaw motorcycle club akin to the Hells Angels. The Attorney General argues that since there was no evidence about the Hells Angels, any connection between the Jus Brothers and the Hells Angels was benign. Again, we disagree. The lack of specific evidence about the Hells Angels allowed free rein to the jury's bias and prejudice. More than 40 years ago, this court took judicial notice that "[m]ost of the northern California public regard Hells Angels or members of a motorcyclists' organization of that name with distaste . . . ." (*People v. McKee* (1968) 265 Cal.App.2d 53, 59 [71 Cal.Rptr. 26]; see also *People v. Sawyer* (1967) 256 Cal.App.2d 66, 79 [63 Cal.Rptr. 749] [prosecutor's reference to defendants' membership in Hells Angels raises concern], criticized on another point in *People v. Alvarez* (1996) 14 Cal.4th 155, 219, fn. 23 [58 Cal.Rptr.2d 385, 926 P.2d 365].)

█ The Attorney General argues there was no evidence the Jus Brothers "was a criminal enterprise akin to the Hell's Angels" and little evidence the Jus Brothers supported the Hells Angels. There was no evidence the Jus Brothers was a criminal enterprise and the only evidence of a connection between the two groups was that some individual members of the Jus Brothers wore patches in support of the Hells Angels, usually in memory of a friend, members of the Jus Brothers attended functions put on by the Hells Angels, and the Jus Brothers Web site had a link to the Hells Angels Web site.

The prosecutor, however, repeatedly made that connection for the jury by statements, argument and insinuation.[8] In opening statement he told the jury about the Jus Brothers. "And to be a one-percenter in this area, you have to be a supporter of the Hell's Angels. And many of them will wear the support patch of the Hell's Angels. And they'll tell you, Hell's Angels are the dominant club in the area. And they exist with their blessing." The prosecutor repeatedly questioned witnesses about whether the Jus Brothers could exist without the Hells Angels' blessing; comparing the Jus Brothers to the Hells Angels; their support for the Hells Angels; whether Jus Brothers carried knives; and criminal acts by other Jus Brothers. In closing argument, the

---

[8] That the jury considered this evidence is shown by the foreman's letter to the court about the suitability of Juror No. 7 for jury service. The foreman complained Juror No. 7 reached conclusions based on personal opinion. "She stated that she thought Mr. Mayo [the prosecutor] was 'rude and mean' for allegedly portraying 'anyone who joins a motorcycle club as a bad guy.' We discussed at length the testimony regarding the Jus[] Brothers, particularly the significance of the 1% patch, the 'warrior Spirit,' and the prolonged membership process. This had no effect on [Jn. 7]'s opinions, though she did claim that she would 'be upset' if her son (who rides a motorcycle) joined the Hell's Angels."

prosecutor argued the code of the Jus Brothers and "1%ers." In rebuttal, he again tied them to the Hells Angels. "Jus Brothers wear red-and-white support for Hell's Angels. They wear the 81 patch, which we went through, HA. They have links to the Hell's Angels['] sites. When Rebel Riley was served his sub, he was on his way to a Hell's Angels' crab feed. Jus Brothers are one-percenters. They are nothing like police officers' motorcycle clubs. And you know what, it would be an honor for them to be compared to Hell's Angels and you all know that." In sum, we recognize that with an appropriate foundation and limitations, testimony regarding the beliefs and practices of an organization may be relevant to explain the conduct of a member on a particular occasion. This did not happen here. We conclude, on this record, the trial court erred in admitting wholesale the evidence of the Jus Brothers motorcycle club and its alleged connection to the Hells Angels.

*Prejudice*

"It is . . . well settled that the erroneous admission or exclusion of evidence does not require reversal except where the error or errors caused a miscarriage of justice. [Citations.] '[A] "miscarriage of justice" should be declared only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' [Citations.]" (*People v. Richardson* (2008) 43 Cal.4th 959, 1001 [77 Cal.Rptr.3d 163, 183 P.3d 1146] [quoting harmless error standard announced in *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]].) In applying this standard of prejudicial error, we conclude that, as to all counts, there is a reasonable probability that Prater and Memory would have obtained a more favorable result absent the admission of the irrelevant, inflammatory evidence about the Jus Brothers.

■ "Legions of cases and other legal authorities have recognized the prejudicial effect of gang evidence upon jurors. [Citations.]" (*People v. Albarran* (2007) 149 Cal.App.4th 214, 232, fn. 17 [57 Cal.Rptr.3d 92].) That prejudice not only affects the jurors' assessment of the defendants' credibility, but also taints their view of events with the inference of the defendants' criminal disposition.[9] "We have recognized that admission of evidence of a criminal defendant's gang membership creates a risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty of the offense charged. [Citation.]" (*People v. Williams, supra,* 16 Cal.4th 153, 193.)

---

[9] The People offered the Jus Brothers evidence in the case-in-chief to show defendants' criminal disposition, not to impeach their credibility after they took the stand. (See Evid. Code, § 1101, subd. (c).) Of course, impeachment evidence is subject to exclusion under Evidence Code section 352 where it is unduly prejudicial. (*People v. Wheeler* (1992) 4 Cal.4th 284, 296 [14 Cal.Rptr.2d 418, 841 P.2d 938].)

Here that taint was particularly prejudicial as the outcome of this case depended heavily on questions of defendants' mental states.

In excluding the expert testimony, the trial court recognized the potential prejudice of such testimony because the defense relied entirely on credibility. Given the jumble of inconsistent descriptions of the fight, this was not a case where the jury had only to choose between the People's and the defense's version of events and the evidence was overwhelming in favor of the prosecution. Many of the witnesses were suspect and, once the jury determined what each defendant did, it then had to determine defendants' states of mind, considering such questions as intent to kill, heat of passion, reasonable and unreasonable self-defense. The evidence about the Jus Brothers served not only to destroy defendants' credibility and paint them as violent, but also to bolster the credibility of prosecution witnesses who were otherwise suspect. The prosecutor relied heavily on the Jus Brothers evidence to show defendants were guilty and in arguing "this case is strong for intent."

In *People v. Watson, supra,* 46 Cal.2d 818, the trial court erred in admitting evidence on cross-examination that improperly degraded the defendant. The Supreme Court found the error harmless because the defendant was able to give an explanation "designed to remove any derogatory effect" and the uncontradicted evidence "unerringly pointed to defendant's guilt." (*Id.* at p. 837.) That is not the case here. Without the irrelevant, inflammatory evidence, a different outcome on all counts was reasonably probable, even if the jury largely accepted the prosecution's version of events.

*Defendant Prater*

As to defendant Prater, the evidence established he stabbed Donahue. However, even if the jury disbelieved his claim of self-defense, the circumstances—particularly the noise and the confusion, that Miller's group of large, drunken men started the confrontation and outnumbered Memory and Prater, and the presence of Prater's wife in the midst of what was described as a melee—provided evidence from which the jury could find Prater's offense was less than murder. Absent evidence he was a member of a motorcycle club akin to the Hells Angels, it is reasonably probable the jury would have reached a more favorable verdict.

*Defendant Memory*

In Memory's case, the evidence was conflicting as to whether he stabbed Miller. Miller's own testimony, as well as that of Johnson, Walker, Thrasher and Memory, pointed to another assailant. That theory found support in

Enos's admission that he left the scene shortly after the stabbings, showing a consciousness of guilt, and evidence Enos had a knife. Further, as discussed below, Scott's testimony, which conflicted with other testimony, was less than compelling. It is reasonably probable that the jury, without evidence that significantly damaged Memory's credibility and showed a character for violence, would have had a reasonable doubt and would have reached a different verdict as to the assault and attempted voluntary manslaughter of Miller.

It was uncontested Memory stabbed Scott. Whether he did so in reasonable or unreasonable self-defense and without an intent to kill was hotly disputed.[10] The motorcycle gang evidence was particularly inflammatory in showing Memory's propensity for violence. We find it reasonably probable that if the evidence of his membership in a motorcycle club with ties to the Hells Angels had not been admitted, the jury would have reached a different result on attempted voluntary manslaughter, with its intent to kill requirement.

We next address count 5, Memory's assault on Scott. Memory admitted he stabbed Scott; his defense to the assault charge was self-defense. Memory claimed he stabbed Scott as Scott swung a cable at him. Memory claimed that earlier Scott swung the cable near the motorcycles. Scott testified Memory stabbed him from behind instead of during a confrontation, as was the case in the assault on Miller. The wound itself does not support either party's testimony. The location of Scott's wound was on the left rear side below his shoulder, near the armpit, puncturing Scott's lung. The wound was not in the middle of Scott's back, so Scott could have been facing Memory and turned at the time of the stabbing, which would be consistent with Scott swinging a cable, as Memory testified. Memory's actions afterwards, calling only Jus Brothers but not the police, throwing the knife away, and not coming forward when the Ewings were arrested, showed a consciousness of guilt. As we stated previously, the motorcycle gang evidence was particularly inflammatory in showing Memory's propensity for violence. Given the conflicting state of the evidence, had the inflammatory motorcycle gang evidence been excluded, it is reasonably probable the jury would have reached a different result on the assault on Scott.

## II.–IV.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[10] Memory argues this was a close case, as shown by the 15 days of sometimes contentious jury deliberation. The jury hung on the charge of attempted murder of Scott. After the People dismissed this charge, the jury convicted Memory of attempted voluntary manslaughter.

[*]See footnote, *ante*, page 835.

## DISPOSITION

The judgments on counts 1, 2, 3, 4 and 5 are reversed. The weapon enhancement under Penal Code section 12022, subdivision (b) attached to count 5 is stricken. Retrial on count 2 is barred.

Sims, Acting P. J., and Raye, J., concurred.

A petition for a rehearing was denied March 24, 2010.