Filed 9/10/20  P. v. Ruiz CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>GUADALUPE RUIZ,<br><br>    Defendant and Appellant. | F076454<br><br>(Super. Ct. No. BF162719B)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Brian M. McNamara, Judge.

Kendall D. Wasley, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Nirav K. Desai, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Guadalupe Ruiz was convicted by a jury of second degree murder for his role in the fatal beating of Abel Prendiz.  Ruiz kicked Prendiz in the head after the victim had already been beaten by Ruiz's co-defendant, Quinton James.  Prendiz died in

the hospital 18 days after the assault. Ruiz raises four contentions on appeal: (1) there was insufficient evidence he acted with implied malice as required for second degree murder; (2) the trial court erred in not giving the jury an involuntary manslaughter instruction; (3) the trial court erred in admitting evidence of a prior bad act he committed the same day as the assault on Prendiz; and (4) his three prior prison term enhancements must be stricken pursuant to newly enacted Senate Bill No. 136. We agree with his fourth contention only. We therefore order those sentencing enhancements stricken, and otherwise affirm.

## STATEMENT OF THE CASE

The Kern County District Attorney filed an information charging Ruiz and his co-defendant, Quinton James, with first degree murder for killing Abel Prendiz. The information also alleged Ruiz had suffered six prior convictions resulting in prison sentences.

The information was later amended to charge Ruiz with second degree murder. Ruiz pleaded not guilty and denied all alleged enhancements, resulting in a jury trial. James entered into an agreement with the prosecution wherein he pleaded no contest to voluntary manslaughter and agreed to testify for the prosecution in exchange for a 14-year prison term. The jury convicted Ruiz of second degree murder, and in a separate court trial the court found true four of Ruiz's six alleged prior prison terms.

The prosecution filed an amended information on the day of sentencing. On October 12, 2017, Ruiz was sentenced to a term of 18 years to life in prison as follows: 15 years to life for the murder, plus an additional three years for three prison prior convictions.

**FACTS**

**I.** **The homicide**

On November 9, 2015,[1] between 4:00 p.m. and 4:30 p.m., 55-year-old Abel Prendiz and his girlfriend, M., arrived home at their apartment complex after running errands. While Prendiz and M. sat in their truck, two men in a black truck drove up and parked in the parking stall next to them. The men, Ruiz and James, went into the apartment next to Prendiz and M.'s, which belonged to a woman named A. Ruiz and James had been drinking and decided to visit A. A. had known James his whole life, and had known Ruiz approximately five years. She referred to James as her "cousin."

Within five minutes, James came out of A.'s apartment, angry, cussing, and swinging his hands. A. described James as "frantic." Prendiz and M. were unloading things from their truck when James looked in the direction of Prendiz and M. and said, "What the fuck are you looking at?" Ruiz was still inside of A.'s apartment at this time. James ran towards Prendiz and started hitting him. James's first strike was to Prendiz's face. Prendiz fell to the ground, and James got on top of him and continued hitting him.

As Prendiz was on the ground getting hit by James, Ruiz approached M. and stood "nose to nose" with her. He then went over to Prendiz and James and began hitting Prendiz. M. testified Ruiz kicked Prendiz in the head "very many times." When asked what part of Prendiz's head Ruiz kicked, M. responded, "On the top, on the side, on his ear, in his face, everywhere." M. yelled at the men to stop and that they were hurting him. However, as M. testified, "They wouldn't stop. They just kept going, kept on and on. They had no mercy. No mercy." A. was also present and was yelling at James and Ruiz to stop. A. and M. tried to pull James off of Prendiz, but he "swung" at them and caused them to go "flying." A. testified she tried to get Ruiz to assist her in pulling James off of Prendiz, but Ruiz did not help. M. continued to yell at the men to stop and

---

[1] References to dates are to dates in 2015 unless otherwise stated.

said, "You are going to kill him." M. testified blood was "gushing" from Prendiz's head. A. testified "there was a lot of blood." According to M., the beating continued until M. yelled, "Look at all the blood." According to A., the beating stopped when A. told them "the cops are coming right now." Ruiz and James then stopped and fled.

M. testified Prendiz's head "was bleeding all around," his mouth was "busted up inside and out," his ear and head were "stretched out," and his eyes were blackened. She said his head "was like a cone head, but to the side."

James testified as part of his plea agreement. He initially testified he was standing in the doorway of A.'s apartment when he heard Ruiz and Prendiz "exchanging words." However, he later testified Ruiz was in the apartment when the fight started. James approached Prendiz, started "talking trash," accused Prendiz of stealing something, and then began fighting. Prendiz did not provoke the fight, and James did not know why he was "talking trash" and accusing Prendiz of stealing something. James had never met Prendiz before. After the first few blows, Prendiz went into his apartment but then came back outside. James immediately resumed his attack on Prendiz. Prendiz fell to the ground and James got on top of Prendiz and continued to punch him. James said he punched Prendiz in the face "quite a bit." Two women were yelling at him to stop and that he was going to kill Prendiz, at which point he stopped hitting Prendiz. After James stopped, Ruiz "just went up to [Prendiz] and kicked him one time" in the "head or face" with his steel-toed boot. James stated Ruiz "kicked the shit out of [Prendiz]," and said the kick took the attack "to another level." James and Ruiz then left. James and Ruiz returned to A.'s apartment later in the day looking for something, but A. told James that the victim had been taken to the hospital, the police were coming, and they had to leave. James went home and Ruiz went to his own house.

Detectives obtained surveillance video from a nearby trailer that captured portions of the incident. Excerpts of the footage were shown to the jury. The footage showed the beginning of James's attack on Prendiz, but did not capture approximately 60 seconds of

4.

the fight that occurred outside of the camera's view. The footage did not capture Ruiz kicking Prendiz. The footage did, however, show Ruiz trying to break up the fight between James and Prendiz.

A. testified at trial she did not recall Ruiz participating in the attack or kicking Prendiz. However, this was contradicted by her 911 call, which she made at 4:22 p.m. on the date of the attack. Despite her 911 call being played for the jury while she was on the witness stand, she stated she did not recall calling 911. She testified she did not want to be a witness. She explained her reluctance was due to her being from the "old school," and that she was afraid of being a "snitch at a murder trial" and feared retaliation. A. also said during an interview with a detective that "they" kicked Prendiz "once or twice." However, when presented with this prior statement at trial, A. said she did not recall seeing a kick and did not know why she told the detective that.

During her 911 call, A. requested an ambulance be sent out to her address. She told the operator her neighbor "need[ed] an ambulance because they, they, they beat him up." She stated Prendiz was awake and breathing, but had "blood all over his face" and was "losing a lot of blood right now …." The operator asked if there was "any serious bleeding," and A. responded "yeah on his face he's got a big contusion" and said it was bloody by his left temple. The operator instructed her on how to apply a towel to stop the bleeding.

An ambulance crew arrived at the scene, and Prendiz was able to speak with them. He was alert and oriented, and stated he was "punched and kicked" by two men. Prendiz nodded his head when a paramedic asked if he was okay. According to the paramedic, Prendiz's head injuries included a large contusion, a laceration, redness, substantial swelling on the left side of his face, swelling at his cheekbone under his left eye, and a large hematoma extending from the left temple down to the top of his upper lip. The paramedic described his injuries as a "major injury." Prendiz was able to walk two or three feet to get onto the gurney.

Prendiz arrived at the hospital and appeared to be in pain and "hurt pretty bad." He had multiple brain injuries, including subarachnoid and subdural bleeds. The brain injuries were on both his right and left side. He also had multiple facial fractures: in his jaw, cheekbone, maxillary area, and left orbital socket. His eye was swollen and bruised.

His attending physician testified Prendiz was speaking coherently when he arrived at the hospital on November 9, and the next day he seemed to be doing "okay" and progressing well. The physician testified the majority of brain bleeds are survivable, but "[a]ll brain bleeds are serious" due to the risk of brain damage and brain death. On November 11, the brain bleeding seemed well-contained, and doctors decided Prendiz could go home and finish recovering with bed rest. According to doctors, when Prendiz was discharged on November 11, he seemed neurologically stable and had only a minor headache.

Prendiz's daughter drove him home, with M. also riding in the car. Prendiz repeated himself multiple times during the ride, and seemed very tired. That night, he complained of being in pain, could not chew food, and said, "I don't think I'm going to make it." The next morning, he told M. he was still in pain and said, "I'm not going to make it." M. went to the pharmacy and picked up his prescription medications. When she returned home, she found Prendiz unconscious on the bathroom floor. She called 911, and Prendiz was taken back to the hospital.

Prendiz was "severely impaired" when he arrived back at the hospital. A CT scan revealed massive swelling and a subdural bleed that was "very large" and "causing compression of the brain." The bleed was in the "same approximate location" as the initial bleed. Emergency brain surgery was done to alleviate the swelling. After the surgery, Prendiz remained in a coma until his family eventually decided he be provided "comfort care." He died on November 27. One of his attending physicians testified his injuries were consistent with a "traumatic assault" and opined the assault caused his

death.  Before Prendiz died, surgeons told one of Prendiz's daughters Prendiz would need separate facial reconstruction surgery.

An autopsy was performed on December 3.  The forensic pathologist testified Prendiz's death was caused by "blunt head injuries."  The injuries would be consistent with a kick from a steel-toed boot, and a single kick from such a boot could have been sufficient to cause the death.  However, the nature of the brain bleeding indicated there were probably multiple blows.  The pathologist additionally observed bleeding over the "top back skull" underneath the tissues tightly covering the skull, which indicated a "deeper, more extensive type of injury."  The fractured facial bones were a sign of "fairly severe force."  The fractures would more likely come from kicks than fists.  The pathologist also noted an unusual lack of abrasions on Prendiz, as one would expect to see abrasions on someone's face who had been kicked with steel-toed boots.  However, it is possible the tip of a smooth rubber boot could tear the skin without abrading it.

The pathologist also testified Prendiz was a "very sick man with many chronic diseases."  Prendiz's liver was also "shot," which made him an "easy bleeder."  The pathologist opined a healthy person would "probably not" have died from the injuries Prendiz sustained.  He stated Prendiz's damaged liver would explain why the bleeding would have gotten worse after he was released from the hospital.

Ruiz and James were arrested in early January 2016.  During Ruiz's interview with detectives, Ruiz denied helping James in the fight and kicking or punching Prendiz.  He said he tried to break up the fight.  Ruiz said he had been fighting his whole life and that he had never kicked anybody before during a fight.  He said, "I usually just use my fists."  He stated he had been kicked before and knows how it feels.  He acknowledged kicking someone can cause "serious injury," which is why he said he never kicks anybody during fights.  He also acknowledged steel-toed boots can be considered a "weapon" and fists "can do some damage."  He further agreed with one of the detectives

that James was "whippin' [Prendiz's] ass" at the end of the fight and that Prendiz was on the ground. Ruiz said Prendiz "was getting wailed on" and "took so many fuckin' hits."

## II. Evidence of prior bad act

Earlier on November 9, Ruiz and James were at the house where James was staying, drinking alcohol. Ruiz and James had been friends for 10 years. Another man, D., was also at the house repairing windows and a fence. For no reason, Ruiz shot several BB's from a BB gun at D. and D.'s truck. Several of the BB's struck D and his truck.

D. became upset and approached Ruiz and said, "What the fuck?" Ruiz apologized and gave D. 100 dollars. D. responded, "What? It's not even about that." As D. was loading his tools into his truck, Ruiz punched D. in the face and began "swinging" at D. D. got back to his feet and ran around a car to gather himself. D. attempted to throw a punch at Ruiz, but Ruiz caught D. with a punch that knocked D. to the ground. Ruiz began kicking D. in the ribs several times while wearing steel-toed boots. As D. lie on the ground, looking up, Ruiz lifted his boot and prepared to stomp on D. D. could see the bottom of Ruiz's boot coming at his head. But before Ruiz could bring his boot all the way down, James tackled Ruiz. James told D. to leave and said he would talk to D. later. D. got into his truck and drove away. D. suffered a black eye and "beat up" ribs.

## DISCUSSION

## I. Sufficiency of the evidence of implied malice

Ruiz was convicted of the second degree murder of Prendiz based on the prosecution's theory of implied malice. Murder is the unlawful killing of a human being or a fetus with malice aforethought. (Pen. Code,[2] § 187, subd. (a).) For second degree murder, the malice can be implied. (§§ 187, subd. (a); 188.) There is both a physical and mental component to implied malice. (*People v. Guillen* (2014) 227 Cal.App.4th 934,

---

[2] Undesignated statutory references are to the Penal Code.

984.)  " ' "The physical component is satisfied by the performance of 'an act, the natural and probable consequences of which are dangerous to life.'  [Citation.]  The mental component is the requirement that the defendant 'knows that this conduct endangers the life of another and … acts with a conscious disregard for life.' " ' "  (*People v. Bryant* (2013) 56 Cal.4th 959, 965 (*Bryant*).)  In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another.  (*People v. Cravens* (2012) 53 Cal.4th 500, 507 (*Cravens*).)

Ruiz contends there was insufficient evidence to support the mental component of implied malice.  "Our task is clear.  'On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence— that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]' … The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' "  (*Cravens, supra,* 53 Cal.4th at pp. 507-508.)  "All conflicts in the evidence are resolved in favor of the judgment …."  (*People v. Neely* (2009) 176 Cal.App.4th 787, 793.)  We "must … presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.  [Citation.]  [¶]  Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends."  (*People v. Jones* (1990) 51 Cal.3d 294, 314.)  Following these well-established standards of appellate review, we conclude there was ample evidence Ruiz was well aware that kicking Prendiz in the head endangered his life.

The mental component of implied malice can be satisfied "if [Ruiz] knew that his conduct endangered [Prendiz's] life and he acted with a conscious disregard for life."  (*People v. Palomar* (2020) 44 Cal.App.5th 969, 977.)  " 'This component is ordinarily

9.

proven by illustrating the circumstances leading to the ultimate deadly result.' " (*Ibid.*) " 'Of course, the jury was entitled to infer [Ruiz's] subjective awareness that his conduct endangered [Prendiz's] life from the circumstances of the attack alone, the natural consequences of which were dangerous to human life. [Citation.] But [Ruiz's] behavior before and after [his kick] further demonstrated that this was not … a simple fistfight …. These facts, too, bolstered the finding of implied malice.' " (*Id.* at p. 978.)

Prendiz was a vulnerable victim at the time Ruiz kicked him in the head (at least once) with steel-toed boots. Prendiz had already been hit multiple times in the head by James, he was bleeding, and M. and A. were yelling at James and unsuccessfully trying to get James to stop his onslaught. Ruiz was aware of these circumstances, and decided to kick the already beaten 55-year-old Prendiz in the head with steel-toed boots anyway. By the time Ruiz and James finished their attack, Prendiz's head was bloody and deformed, like a "conehead." Ruiz's conduct after the fight also evidences implied malice. Ruiz and James only stopped the assault after A. yelled "you are killing him." At that point, rather than render aid, call 911, or otherwise express any remorse, the two attackers fled. Additionally, during his post-arrest interview with detectives, Ruiz stated he considered steel-toed boots to be a "weapon" capable of causing "serious damage," which he explained is the reason he "does not kick people in fights."

The evidence presented at trial portrayed a brutal, merciless, unnecessary, and unfair (i.e., two men against one) beating of an innocent and vulnerable victim. The evidence further demonstrated Ruiz knew his boots were weapons and knew kicking the vulnerable and already beaten Prendiz in the head would endanger his life. There was thus sufficient evidence of implied malice to support the second degree murder conviction.

## II. Failing to instruct on involuntary manslaughter

Ruiz next contends the trial court prejudicially erred by not instructing the jury on the lesser included offense of involuntary manslaughter. The trial court instructed the

jury on second degree murder and the lesser included offense of voluntary manslaughter. Ruiz's trial counsel requested an instruction on involuntary manslaughter due to voluntary intoxication, but admitted he did not see a basis for such instruction. Ruiz did not otherwise request an involuntary manslaughter instruction. The People objected to an involuntary manslaughter instruction because of a lack of evidence supporting the absence of malice. The court declined to give an involuntary manslaughter instruction because it did not "find any facts to support the warranting of giving involuntary manslaughter in this case." Ruiz argues the trial court had a sua sponte duty to instruct on involuntary manslaughter. Alternatively, he argues that if the court did not have a sua sponte duty to so instruct, his trial counsel was ineffective for failing to request an involuntary manslaughter instruction.

We conclude the evidence presented at trial did not create a reasonable doubt that the fatal assault on Prendiz was second degree murder on an implied malice theory. As such, the trial court would have had no duty to instruct on involuntary manslaughter, even had a request been made.

### A.      Law and Analysis

" 'The trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request.' … 'That obligation encompasses instructions on lesser included offenses if there is evidence that, if accepted by the trier of fact, would absolve the defendant of guilt of the greater offense but not of the lesser.' … 'To justify a lesser included offense instruction, the evidence supporting the instruction must be substantial—that is, it must be evidence from which a jury composed of reasonable persons could conclude … "that the lesser offense, but not the greater, was committed." … "On appeal, we review independently the question whether the trial court failed to instruct on a lesser included offense." ' " (*People v. Souza* (2012) 54 Cal.4th 90, 115–116, citations omitted.)

11.

The theory of involuntary manslaughter Ruiz contends was warranted by the evidence here is described in *People v. Brothers* (2015) 236 Cal.App.4th 24 (*Brothers*). Under that theory, a defendant is guilty of involuntary manslaughter when he or she commits a killing, without malice, during an inherently dangerous assaultive felony. (*Id.* at pp. 33–35.)

To explain how the *Brothers* court reached its conclusion that a killing, without malice, during an inherently dangerous assaultive felony is involuntary manslaughter, some background discussion would be helpful. Manslaughter is defined as "the unlawful killing of a human being without malice." (§ 192.) Further, involuntary manslaughter is defined as an unlawful killing "in the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192, subd. (b).) In *Bryant, supra,* 56 Cal.4th at p. 970, our Supreme Court explained that although the Penal Code does not specify the type of manslaughter committed when a defendant kills without malice during an inherently dangerous assaultive felony, such a killing is not voluntary manslaughter. Because review was not granted on the issue, *Bryant* expressly declined to address whether a killing without malice during an inherently dangerous felony could support a conviction for involuntary manslaughter. (*Id.* at pp. 970–971.) However, Justice Kennard's concurrence analyzed the issue and concluded a defendant who kills unlawfully during an assault with a deadly weapon, but without malice, may be found guilty of involuntary manslaughter. (*Id.* at pp. 971–974, conc. opn. of Kennard, J..)

*Brothers* directly considered the issue not reached by *Bryant* but addressed in Justice Kennard's concurrence. The *Brothers* court agreed with Justice Kennard, explaining that "if an unlawful killing in the course of an inherently dangerous assaultive felony without malice must be manslaughter … and the offense is not voluntary manslaughter …, the necessary implication of the majority's decision in *Bryant* is that the offense is involuntary manslaughter. Accordingly, an instruction on involuntary

12.

manslaughter as a lesser included offense must be given when a rational jury could entertain a reasonable doubt that an unlawful killing was accomplished with implied malice during the course of an inherently dangerous assaultive felony." (*Brothers, supra,* 236 Cal.App.4th at pp. 33–34.) However, as the *Brothers* court cautioned, "when, as here, the defendant indisputably has deliberately engaged in a type of aggravated assault the natural consequences of which are dangerous to human life, thus satisfying the objective component of implied malice as a matter of law, and no material issue is presented as to whether the defendant subjectively appreciated the danger to human life his or her conduct posed, there is no sua sponte duty to instruct on involuntary manslaughter …. Otherwise, an involuntary manslaughter instruction would be required in every implied malice case regardless of the evidence. We do not believe that this is what the Supreme Court intended in *Bryant*." (*Id.* at p. 35.)

Ruiz was entitled to an instruction on involuntary manslaughter pursuant to *Brothers* only if a rational jury could entertain a reasonable doubt that Prendiz's killing, although occurring during a beating with fists and kicks, was accomplished without malice. (*Brothers, supra,* 236 Cal.App.4th at pp. 33–34.) "Malice is implied when an unlawful killing results from a willful act, the natural and probable consequences of which are dangerous to human life, performed with conscious disregard for that danger." (*People v. Elmore* (2014) 59 Cal.4th 121, 133.)

The thrust of Ruiz's argument suggests there was evidence presented at trial from which the jury could have concluded he was guilty of involuntary manslaughter on the theory that the natural and probable consequences of his kick to Prendiz's head were not dangerous to Prendiz's life.[3] Ruiz draws attention to the facts that Prendiz did not lose consciousness at the scene and talked to paramedics, that Prendiz was able to walk two or three feet unassisted to the gurney, and that a healthy person likely would not have died

---

[3] For purposes of analyzing this issue, we presume Ruiz kicked Prendiz only once.

13.

from the same injuries. He argues these facts could have allowed the jury to entertain a reasonable doubt about the dangerousness of the kick, had the jury been instructed with involuntary manslaughter. However, these facts that Ruiz highlights need not—indeed, must not—be examined in a vacuum. Rather, these facts must be considered within the totality of the facts and surrounding circumstances. When all of the facts and circumstances are properly considered together, the record is devoid of evidence from which a reasonable jury could conclude Ruiz was guilty of involuntary manslaughter on the theory the kick was not dangerous to human life.

Prendiz was 55 years old, had already been "wailed on" by James, and was on the ground in a vulnerable position. As Ruiz said, Prendiz had already taken "so many fuckin' hits." Ruiz was also wearing steel-toed boots, and kicked Prendiz in the head, a vulnerable part of the body housing the brain. The beating was so brutal it resulted in multiple facial fractures, massive bleeding, brain injuries, and a deformed head. Had Prendiz survived, facial reconstruction surgery would have been needed. The responding paramedic described Prendiz's injuries as "major," and an attending physician described them as "fairly serious."

Even though Prendiz was not rendered unconsciousness at the scene and a healthier person would likely have survived, the totality of the facts and circumstances nevertheless indisputably demonstrate the natural and probable consequences of the kick were dangerous to Prendiz's life. The evidence demonstrated Ruiz participated in a brutal, merciless beating, and that his kick, which was delivered after Prendiz had already sustained substantial injuries, was dangerous to Prendiz's life. Stated differently, while Prendiz's remaining conscious at the scene and his infirm health are factors that would tend to support Ruiz's argument that the kick was not dangerous to Prendiz's life, these facts pale when considered in light of the totality of the facts and circumstances that indisputably demonstrate the kick was dangerous to Prendiz's life. This was not a simple

14.

fist fight in which a single unlucky blow resulted in the victim's death. (*People v. Cook* (2006) 39 Cal.4th 566, 597.)

Additionally, Ruiz seems to suggest that the fact he was not the initial aggressor and that he at first tried to break up the fight demonstrate a lack of malice. However, regardless of what Ruiz initially did or did not do, he eventually decided to kick an injured and vulnerable victim in the head with steel-toed boots. There was no evidence presented the kick was an accident or in self defense. Rather, the evidence demonstrated the kick was intended to injure Prendiz.

In sum, the evidence at trial did not raise a material issue as to whether the killing was committed without malice, and therefore the trial court had no duty to instruct on involuntary manslaughter as a lesser included offense. (*Brothers, supra,* 236 Cal.App.4th at p. 35.)

## III. Evidence of prior bad act

Finally, Ruiz contends the trial court prejudicially abused its discretion in allowing the jury to hear the evidence of the incident involving D. The court admitted the evidence for the limited purpose of proving Ruiz's knowledge of the risk to human life that would follow from kicking someone in the head with steel-toed boots. We conclude the trial court improperly allowed the evidence of this incident, but conclude Ruiz did not suffer prejudice.

Evidence of prior convictions or uncharged crimes is inadmissible to establish propensity to commit a crime on a particular occasion. (Evid. Code, § 1101, subd. (a).) Subdivision (a) of Evidence Code section 1101 provides that subject to certain exceptions "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." Evidence of prior convictions or uncharged crimes is admissible, however, to prove "that a person committed a crime, civil wrong, or other act when relevant to prove

15.

some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, ...) ...." (Evid. Code, § 1101, subd. (b).)

" 'The admissibility of other crimes evidence depends on (1) the materiality of the facts sought to be proved, (2) the tendency of the uncharged crimes to prove those facts, and (3) the existence of any rule or policy requiring exclusion of evidence.' " (*People v. Lindberg* (2008) 45 Cal.4th 1, 22.) "The trial court has great discretion in determining the admissibility of evidence ...." (*People v. Williams* (2009) 170 Cal.App.4th 587, 606; accord, *People v. Valdez* (2012) 55 Cal.4th 82, 170.) A trial court's decision to admit evidence of uncharged offenses under Evidence Code sections 1101, subdivision (b), and 352 is reviewed for an abuse of discretion. (*People v. Foster* (2010) 50 Cal.4th 1301, 1328 (*Foster*).) Reversal is warranted only if " ' "the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*Id.* at pp. 1328–1329; see also *People v. Memory* (2010) 182 Cal.App.4th 835, 862 [" 'erroneous admission … of evidence does not require reversal except where the error … caused a miscarriage of justice' "].) "[A] 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*); see *People v. Rains* (1999) 75 Cal.App.4th 1165, 1170.)

Here, Ruiz's knowledge of the dangerousness to human life of a kick to the face with steel-toed boots was certainly material. He was charged with murder on an implied malice theory, which requires a showing Ruiz had knowledge of the dangerous of his conduct to human life.

However, the D. incident did not have a tendency to prove Ruiz's knowledge of the dangerousness to human life of kicking someone in the head with steel-toed boots because James stopped Ruiz from kicking D.'s head. Since the kick was thwarted, Ruiz

16.

was not able to observe the damage his kick would have caused to D. The People argue James's act of stopping Ruiz from stomping on D. conveyed to Ruiz that kicking a person with steel-toed boots would be dangerous to human life. We reject the People's argument. It is an unreasonable leap to say that James prevented the stomp because he knew the stomp would have endangered D.'s life, and that this knowledge was silently imparted to Ruiz. There was no evidence presented James or anyone else told Ruiz that stomping or kicking a person in the head with steel-toed boots would have endangered someone's life. Thus, it was improper to allow evidence of this incident as probative of Ruiz's knowledge of the danger to human life from a kick to the head.

Notwithstanding, there was no prejudicial abuse of discretion because no miscarriage of justice resulted. (*Foster, supra,* 50 Cal.4th at pp. 1328-1329.) This is because there is no reasonable probability Ruiz would have obtained a more favorable result absent the admission of the D. incident. (*Watson, supra,* 46 Cal.2d at p. 836.) Ruiz plainly admitted in his post-arrest interview he knew steel-toed boots were a "weapon" capable of causing "serious damage," which he explained is why he did not kick people during fights. While Ruiz did not specifically admit to knowing that kicking someone's head with steel-toed boots endangers human life, such knowledge could nevertheless be inferred from Ruiz's acknowledging boots can cause "serious damage." Furthermore, his knowledge of the dangerousness to human life could be easily gleaned from his statement he does not kick people in fights because of the dangerousness. In sum, Ruiz's knowledge of the risk to human life from kicking someone's head with steel-toed boots could have been easily gleaned from Ruiz's own statements—reference to the D. incident was unnecessary for that purpose.

Additionally, Ruiz contends evidence of the D. incident was nothing more than improper evidence of his violent character. However, Ruiz admitted to detectives he had been fighting "[his] whole life." The details of the D. incident were also not particularly violent or disturbing, especially when compared to the evidence of the homicide.

Furthermore, the jury was admonished that the evidence of the incident "may not be considered … to prove that [Ruiz] is a person of bad character or that he had a disposition to commit crimes."  Thus, while the trial court erred in admitting the evidence of this prior incident, no miscarriage of justice resulted and no reversal is required.

## IV.    Prison prior enhancements

In supplemental briefing, Ruiz contends his three one-year prior prison term enhancements imposed pursuant to section 667.5, subdivision (b) must be stricken in light of Senate Bill No. 136 (2019–2020 Reg. Sess.; Sen. Bill No. 136), which was signed into law on October 8, 2019, and became effective on January 1, 2020.  The People concede the issue, and we agree.

Senate Bill No. 136 amended section 667.5, subdivision (b) regarding prior prison term enhancements.  Under section 667.5, subdivision (a), which remains unchanged, courts are required to impose a three-year sentence for each prior separate prison term served by the defendant where the prior and current offense was a violent felony, as defined in subdivision (c) of section 667.5.  For other felonies, former section 667.5, subdivision (b) imposed an additional one-year term for each prior separate prison term or county jail felony term, except under specified circumstances.  However, amended section 667.5, subdivision (b) imposes that additional one-year term only for each prior separate prison term served for a conviction of a sexually violent offense as defined in Welfare and Institutions Code section 6600, subdivision (b).  (§ 667.5, subd. (b).)  Because none of Ruiz's prior prison terms was served for a sexually violent offense, his section 667.5, subdivision (b) enhancements are now unauthorized under the amended statute.

The parties agree Senate Bill No. 136 applies to Ruiz because the statute is retroactive and applies to all cases not yet final as of its effective date.  (*In re Estrada* (1965) 63 Cal.2d 740, 742; *People v. Garcia* (2018) 28 Cal.App.5th 961, 972.)  Accordingly, Ruiz's three one-year prior prison term enhancements must be stricken.

## DISPOSITION

Ruiz's three one-year prison prior enhancements are stricken.  The trial court is directed to cause to be prepared an amended abstract of judgment reflecting this modification and forward certified copies of the same to the appropriate entities.  The judgment is otherwise affirmed.


                                            SNAUFFER, J.

WE CONCUR:


MEEHAN, Acting P.J.


DE SANTOS, J.

19.