Filed 2/8/23  P. v. Flores CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B316847 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. BA482948 |
| v. | |
| JASON ALEXIS FLORES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Stephen A. Marcus, Judge.  Remanded with directions and otherwise affirmed.

John Steinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, and Gary A. Lieberman, Deputy Attorney General, for Plaintiff and Respondent.

_____

A jury convicted Jason Alexis Flores of first degree murder. He appeals the judgment, arguing he did not receive a fair trial due to evidentiary errors and prosecutorial misconduct. Flores concedes his presentence custody credit should be reduced to 737 days. We affirm the judgment in all other respects and remand for the trial court to modify the judgment to reflect Flores's correct custody credit.

I

A jury convicted Flores of the murder of Aristides Ruiz, a member of the gang La Mirada Locos who used a wheelchair.

The prosecution showed surveillance video of a man approaching a gas station in the Silverlake neighborhood of Los Angeles where Ruiz was talking to people. The man wore long, baggy, gray shorts with a black stripe, had a yellow metal ring on his hand, wore a satchel, and held a gun in his hand. The video shows the same man running back the way he came three minutes later. Surveillance video from a different vantage point shows the man crouching behind a white Scion at the gas station, partially covering his face, extending his arm, and shooting, hitting Ruiz twice. People at the gas station attempted to help Ruiz and called the police. Paramedics took Ruiz to the hospital where he died from the gunshot wounds.

Manuk Tadevosyan worked as a parking attendant at a business next door to the gas station. When Tadevosyan heard the shots, he ran toward the street. A man with a gun ran up to him, pointed the gun at him, and said, "What's up? What's up? What's up?" before continuing to run away. Tadevosyan thought the man was 27 or 28 years old and "Spanish." He was wearing shorts and a green hat and had a small backpack. His

2

body was powerful and a little chubby.  When asked if he saw the man with the gun in the courtroom, Tadevosyan said, "I'm not sure, but maybe that guy," motioning toward Flores.  Tadevosyan stated Flores's body looked the same, but he "forgot the face" because it had been two years.

Detective Martinez, assigned to investigate Ruiz's murder, created a still image from the surveillance video.  He showed the image to Officer Kenny Pintado to see if he could identify the shooter.  Pintado, an officer on the gang enforcement detail in the Rampart Division, thought he recognized the man.  Pintado reviewed his files on people he had stopped in the area of the murder and came across his file on Flores.  Pintado had encountered Flores in a traffic stop about a year earlier.  Flores had been driving the car, and Pintado stayed on the passenger side of the car for the 10- to 15-minute encounter.  Flores had said he was a member of a tagging crew called B.U.D. or B.U.D.S., which stands for Blazing Up Daily, but that he was no longer active.  Flores told Pintado he had a large letter "B" tattooed on top of his head and showed Pintado that he had "B-U-D" tattooed on his stomach.  Pintado had learned about B.U.D.S. from other officers in the gang enforcement detail and seen B.U.D.S. tagging but had not met any members before Flores.  Pintado stopped Flores in the general area he considered B.U.D.S. territory.  Based on the boundaries of the two groups' territories, Pintado testified La Mirada Locos would be a rival of B.U.D.S., a contention confirmed by a conversation Pintado had with a La Mirada Locos member.

Before meeting Flores in person, Pintado had seen Flores's rap music videos on his public YouTube account under his music name of JBoogie283.  The numbers 2, 8, and 3 correlate to the

3

letters "B," "U," and "D" on a phone keypad. Pintado monitored these videos as part of his duties for the gang enforcement detail because gang and tagging crew members sometimes reveal information in their music videos either through the lyrics or through the cars, clothes, or weapons they show. In some of his videos, Flores makes the B.U.D.S. sign and shows his tattoos. In one music video, Flores raps, "Stay true to the B. That's all you gonna see. Me. B," which Officer Pintado testified showed allegiance to the crew and a commitment to stay active.

After Pintado identified Flores, Martinez reviewed Flores's social media. On the account of one of Flores's friends, Martinez saw a picture of Flores posted a day or two before the murder in which Flores was wearing shorts similar to those in the surveillance video and holding an object covered by an emoji that appeared to be a gun. In a posted video, Flores is wearing a yellow metal ring. Another video posted the day of the murder identifies Flores's location at the time as Los Angeles.

When police arrested Flores, they found gray shorts with a black stripe and two yellow metal rings in his room. Police placed Flores in a cell with an undercover agent. Flores told the agent he was a rapper, but when the agent said the risk of losing everything came with the "rap game," Flores twice insisted, "No. It comes with the gang shit," and told the agent "it's always harder for the real ones. It's easy for all these fake-ass fools . . . . Like, fuck. You're rappin about our lives." Flores said he stayed in the San Fernando Valley, but his hood was Los Angeles and "everybody beefs it right there . . . . It's like a big ole war zone." At one point, a detective showed Flores a still image from the surveillance video of the man holding a gun and two pictures of Flores from social media. When he returned to his cell, Flores

4

told the agent, "They showed me, like, three pictures of – of me and then, they showed me pictures with the burner."

A criminal intelligence analyst reviewed the phone records for phone numbers associated with Flores and his girlfriend from the day of the murder. The data showed both phones were in Sun Valley, where Flores lived, around 2:00 p.m. About an hour later, Flores's phone began to move toward Los Angeles, eventually arriving in downtown. The phone then moved toward the location of the murder. About 15 minutes before the murder, Flores's phone pinged off a cell tower 0.3 miles from the murder. Ten minutes later, the cell phone pinged off a cell tower 0.2 miles away. A few minutes after the murder, the cell phone was 0.6 miles away. About an hour after the murder, Flores's phone was in the Glendale area, as was his girlfriend's phone. The two phones then appeared to travel together back to Sun Valley.

At trial, the prosecutor argued Flores killed Ruiz because he wanted to be a real gangster. He wanted to prove he was tough and increase his street credibility by living the lifestyle he raps about. The trial court and counsel had several discussions about what type of gang evidence would be allowed in, with the judge ruling on several in limine motions. Later we discuss these rulings in more detail.

The jury convicted Flores of first degree murder. The jury further found true that Flores had possessed a firearm as a felon, personally and intentionally discharged a firearm in the murder, and previously had been convicted of a serious felony. The trial court sentenced him to 75 years to life. The trial court credited Flores 848 days, based on 737 actual days and 111 good time/work time days.

5

## II

Flores's primary contentions are that he did not receive a fair trial because of prosecutorial misconduct and evidentiary errors relating to gang evidence. These theories overlap in several particulars. None has merit.

## A

We address the evidentiary issues.

## 1

We begin with the erroneous assertion that no evidence supported the prosecutor's theory that Flores shot Ruiz to elevate his status. Flores argues that, because there was no evidence to support this theory, all gang evidence was improper propensity evidence the trial court should have excluded. Flores concedes we review a trial court's admission of evidence for abuse of discretion.

Character evidence is inadmissible to show a person acted in conformity with a character trait on a particular occasion. (Evid. Code, § 1101, subd. (a).) It can be admissible, however, to show motive. (Evid. Code, § 1101, subd. (b).) That is how the prosecutor used it here. She argued Flores wanted to be a "real one" and that is why he shot Ruiz.

To show this is not a "gang case," Flores points to the prosecutor's concession that he was not a gang member, the lack of gang allegations in the case, the prosecutor's concession this was a "one man show," Flores's failure to take credit for the shooting, and the inactivity of B.U.D.S. This misses the thrust of the prosecutor's argument. She readily acknowledged Flores was not a gang member and that B.U.D.S. was not active. The prosecutor's theory instead was that a desire to mimic the gang lifestyle he rapped about in his music motivated Flores.

6

This use of gang evidence is permissible. (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167 [gang evidence is relevant and admissible when "the very reasons for the underlying crime, that is the motive, is gang related"].)

Had the prosecutor argued Flores was a gang member and gang members are violent so therefore Flores was more likely to have killed Ruiz, that would have been improper propensity evidence. That was not the prosecution's theory. Instead, the prosecutor argued Flores acted as he did, including committing this murder, not because he was a violent gang member, but because he wanted to promote his music career, which he did by mimicking gang culture.

The cases Flores cites are not on point. (Cf. *People v. Memory* (2010) 182 Cal.App.4th 835, 859 [gang evidence introduced to show defendants more likely to react violently to provocation]; *People v. Huyhn* (2021) 65 Cal.App.5th 969, 983 [no evidence group of which defendant was a member was a gang].)

It was not an abuse of discretion to admit this evidence.

Flores argues the trial court should have excluded Pintado's testimony because Pintado was not qualified to give an expert opinion about B.U.D.S. Flores notes Pintado had never testified about B.U.D.S. before, did not have personal knowledge about much of the information, and had not met any B.U.D.S. member other than Flores.

Pintado was sufficiently qualified to testify about B.U.D.S. Courts allow gang enforcement officers to testify to knowledge gained from other officers during the course of their duties. (*People v. Sanchez* (2016) 63 Cal.4th 665, 671, 698 (*Sanchez*) [information from other officers appropriate source for expert background testimony on gangs].) As the trial court

7

stated when overruling Flores's objection, Pintado based his knowledge on three sources: 1) conversations with other officers; 2) conversations with Flores himself as well as La Mirada Locos gang members who said B.U.D.S. was a rival organization; and 3) objective physical evidence of the group's existence including graffiti, tattoos, and symbols. This foundation sufficed.

Flores next argues Pintado's testimony was inadmissible because it relied on case-specific hearsay. Case-specific hearsay relates to facts about the events and people involved in the current case. (*Sanchez*, *supra*, 63 Cal.4th at p. 676.) Flores appears to argue because Pintado had no personal knowledge of B.U.D.S., all of his information relied on case-specific hearsay. This is inaccurate. The information Pintado provided was proper background information about tagging crews and B.U.D.S. in general. (*Id.* at p. 698 [testimony about general gang behavior and general conduct and territory of particular gang appropriate background information].) The only arguably case-specific fact Pintado testified to was that Flores was a member of B.U.D.S. Pintado had personal knowledge of that fact, which Flores had admitted to Pintado.

Flores's argument that the prosecutor improperly "imput[ed] criminal street gang culture to a group that does not engage in criminal activities" misses the mark. As the prosecutor made clear, she was not arguing B.U.D.S. engaged in criminal activities or that Flores did so on behalf of B.U.D.S. Rather, she argued Flores engaged in criminal activities on his own to boost his own reputation for the sake of his music career.

Flores lastly argues the trial court erred by allowing the jury to see a clip of his rap video. Flores asserts subdivision (a) of Evidence Code section 1101 banned the video as improper

evidence of Flores's violent character. The court allowed only this lyric: "Stay true to the B. That's all you gonna see. Me. B." These words show Flores's allegiance to B.U.D.S. and his desire to promote that image in his music, which went to the motive argued by the prosecutor. The trial court did not abuse its discretion.

2

Flores's next argument focuses on gang-related and propensity evidence the jury heard despite rulings by the trial court that it was inadmissible. The jury should not have heard this evidence, but none was sufficiently prejudicial to deny Flores a fair trial.

The inadmissible evidence came in through the testimony of Martinez and Pintado. We begin with Martinez's testimony.

Martinez testified police found a gun and ammunition at Flores's residence. Before trial, the trial court granted a motion to exclude this evidence as more prejudicial than probative, a ruling with which the prosecutor agreed. But when the prosecutor asked Martinez, "Do you recall what other items you recovered to associate those shorts to the defendant?," his response mentioned the gun and ammunition. The trial court immediately instructed the jury to disregard the evidence. There was also testimony that police did not find the gun used in the shooting.

This testimony was very brief. Moreover, the jury was aware the gun found was not the one used in the murder.

The trial court's immediate delivery of a curative instruction combatted the prejudice from this trial mishap.

Flores also asserts Pintado brought up inadmissible evidence several times in his testimony. When asked, "if a

9

tagging crew member wanted to gain notoriety or respect, what would a tagging crew member do?," Pintado responded, "So a tagging crew obviously is vandalism where they tag, but the ultimate crime is murder, which is the ultimate crime of violence." The court sustained defense counsel's objection and ordered the testimony stricken. The court later again admonished the jury:

> Court: I want to emphasize to the jurors that the opinion about tagging crew B.U.D.s gaining notoriety by committing murder, that that is not to be considered for any purpose. That testimony was stricken. If you remember, that is what I did. But I further want to say, and there is no foundation for that opinion. Specifically – I forgot now the name of the witness.
>
> Ms. Zavala: Officer Pintado.
>
> Court: Pintado. He said something along the line the B.U.D.s or something engage in vandalism, and then he said the ultimate is murder. That is the part that is stricken. The part that says something about murder. That is stricken. You are not to consider it. There is no foundation for this opinion. It's an inappropriate expert opinion.

The trial court immediately struck Pintado's testimony that a tagging crew member might commit murder, and the court made clear to the jury there was no foundation for the

10

testimony. The trial court's striking of the testimony and strong admonition cured the harm.

During his testimony, Pintado referred to Flores's "gang" tattoos. Defense counsel objected, and Pintado immediately corrected himself. The trial court also instructed the jury to disregard the reference to the gang and admonished the witness to answer appropriately. Later in his testimony, Pintado testified he monitors gang members who make rap videos and that B.U.D.S. was a rival of La Mirada Locos.

Flores argues the "unmistakable message from [Pintado's] testimony was that appellant was a rival gang member of the victim." He argues the jury's exposure to repeated direct and indirect references to Flores as a gang member means the bell could not be unrung.

Although Pintado's testimony could have been clearer, the evidence in the case as a whole conveyed to the jury that B.U.D.S. was not a gang and Flores was not a gang member. When Pintado misspoke, he corrected himself or the court corrected him. There was direct evidence showing Flores was not a gang member and B.U.D.S. was a tagging crew, not a gang. Direct evidence explained the difference between a tagging crew and a gang. In addition, the trial court allowed Pintado's testimony about La Mirada Locos being a rival of B.U.D.S. because Flores's counsel opened the door.

Under these circumstances, the errors were not prejudicial. Nor did they deprive Flores of due process under the federal or California Constitutions.

3

Flores argues these errors violated his rights under state and federal law. He points to the unreliability of eyewitness

11

evidence and argues it should have little weight in harmless error determinations. As discussed in the preceding section, the errors were not prejudicial. Eyewitness evidence did not figure in this analysis. Alone as well as cumulatively, the errors were harmless under state and federal law. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

B

We turn next to Flores's contention that the prosecutor committed misconduct by: 1) "smuggling" in inadmissible evidence; 2) failing to keep Pintado and Martinez from testifying in violation of trial court rulings; and 3) shifting the burden during closing argument. Here, timely objections could have cured any alleged harm. Flores acknowledges a defendant generally must make an objection to preserve a claim of prosecutorial misconduct but argues the prosecutor's pattern of misconduct excused his counsel from complying with this requirement. To show it is futile to object, counsel generally must show it is costly to assert your rights. (E.g., *People v. Hill* (1998) 17 Cal.4th 800, 820-822.) Flores has forfeited these arguments because he has not made this showing.

III

The trial court awarded Flores 848 days of presentence custody credit, based on 737 actual days and 111 days of good time/work time credit. The parties agree, as do we, that Flores was not entitled to presentence conduct credit and the court should reduce his presentence credit to 737 days.

12

## DISPOSITION

We remand for the trial court to correct Flores's presentence custody credit to 737 days.  We otherwise affirm the judgment.


WILEY, J.

We concur:


GRIMES, Acting P. J.


VIRAMONTES, J.